[Crim. No. 4702. Third Dist. Mar. 6, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ALLAN LEE GENTRY, Defendant and Appellant.

Wallace Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Nelson P. Kempsky and Elliott D. McCarty, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant appeals from a judgment sentencing him to state prison after conviction by a jury of inflicting cruel or inhuman corporal punishment upon a child in violation of Penal Code section 273d.

Appellant Gentry's contentions are several. None can be sustained. Principal among the arguable questions on this appeal is that the rule of *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111][1] should be extended to exclude evidence which the trial court here admitted to establish a past recollection recorded. We hold *Johnson* is inapplicable. Other questions are considered under appropriate captions.

Although we do not believe *Johnson* is applicable, we will consider the possibility of a contrary construction. That will bring into focus the question of harmless versus reversible error. That in turn requires a somewhat detailed analysis of the evidence.

Evidence produced by the prosecution showed: K., the 1½-year-old victim, is the youngest of four children of a Mrs. C. Defendant Gentry, 21 years old, was her paramour. He had been living in the C. home for three months. The beating took place on the night of March 26-27, 1967. Mrs. C. was away from the home at work. A baby-sitter cared for the children. Gentry and his friend, Larry Turner, 19, came to the house. The baby-sitter left after the children had been put to bed. The two men watched TV, played records and drank. They retired at 10:30-11 p.m. Mrs. C. came home from work at around 12:45 a.m. Before making her rounds to see if her children were all right Mrs. C. disposed of two empty liquor bottles which she found in the living room. After that, while checking on the children, she heard the baby whimpering and

---

[1]*Johnson* holds that Evidence Code section 1235 permitting (under specified restrictions) evidence of prior inconsistent statements as evidence of the *truth* of the matters stated is, as applied to criminal trials, violative of the Sixth Amendment.

breathing strangely. She picked her up. K. had been critically beaten. The child had a bloody nose. Two ribs had been broken which had impaired her breathing. A lung was collapsed. (K. was rushed to the hospital where emergency surgery was performed.)

When Mrs. C. had discovered her baby in the condition described, she became hysterical, ran into the bedroom where Gentry was sleeping and hit him in the face to awaken him. When he woke up Mrs. C. asked him what had happened.[2] An ambulance was called. Turner, then sleeping on the living room couch, was temporarily awakened with difficulty. He was told to move to a back bedroom and did so. (See fn. 8, *infra.*) The child was put on the couch. Mrs. C.'s mother was called. Sheriff's officers arrived. K. was hospitalized.

At the sheriff's office Gentry gave a statement.[3] Two officers, Tobler and Cole, were present. He told the officers "he never could get along with the child, that whenever he got near the child she started crying, and the child just, apparently, didn't like him at all." One officer suggested that when the child had awakened and "kept crying and giving him a bad time . . . he just lost his mind, because he couldn't quiet down this child, and inflicted injury on the child. And he said: 'Well, that's about it.'" He also told the officers he had been drinking.

Mrs. C. testified to previous mistreatment of the baby by Gentry. It had occurred in February approximately one and a half months before the incident out of which this charge arose.[4]

---

[2]We quote an excerpt from her testimony: "I said, 'Did you do this? And he said, 'Well, what's wrong with her?' And then I remember taking the baby and saying, 'Well, see, see what's wrong with her, this is what's wrong with her. What happened?' And I said, 'Did you do it?' And he said, 'I don't know what's wrong.'"

[3]He was first fairly and fully informed of his constitutional rights in compliance with *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. That fact is not questioned. He elected to talk.

[4]One evening while Mrs. C was at work, Gentry had arrived at the fountain restaurant where she was employed. He sat down at the counter. He was "nervous and upset," "just about to bawl." He told Mrs. C. he had hit the baby, causing "black and blue marks on her face." (Later at home Mrs. C. confirmed this by observation.) But Gentry was contrite, "said that he was sorry, that he didn't mean to hit her that hard. . . ." "[A]nd he was real upset," and said "that if I wanted him to leave . . . he would go." But Mrs. C. had let him stay. The relationship between Gentry and the child, however, was "not very good" after that. The mother thought the child "was just as afraid of him as he was of her."

When Gentry testified (as outlined in more detail below), he admitted the February incident and described it pretty much as Mrs. C. had in her testimony. (See fn. 4.) His testimony: "I ran over there and grabbed her by one of her arms and slapped her across the face two times, forward and backward."[5]

Testimony by the child's grandmother and by the babysitter frequently employed in the home showed that both sides of K.'s face had been bruised as a result of the incident testified to by Mrs. C. and admitted by Gentry.

The child's fear of Gentry was conclusively demonstrated by the evidence. She cried whenever he came near her unless her mother was present.

Larry Turner was a prosecution witness.[6] Turner described the events of the night of March 26-27 up to the point when he had gone to sleep. One of the bottles Mrs. C. had found empty had contained manhattans. When the two young men had arrived that evening it had been half full. They drank its contents. Then Gentry had gone out to a store and bought a bottle of vodka. They drank vodka, using a mix. Turner, unused to intoxicants, got quite drunk.

While the two were drinking, K., the infant, had awakened and started to cry. Gentry had brought her into the living room. She continued to cry for 10 or 15 minutes while Gentry held her on his lap. Turner then took her and she stopped crying. As he held her the child became sleepy. She said she wanted to go "night, night." Turner carried her into her bedroom and put her into her crib.

When Gentry and Turner retired, Turner lay down on the living room couch as Mrs. C. had directed. He went to sleep.

At some point before Mrs. C.'s arrival home, Turner, only partially awake, had heard a child crying from "[t]he back of the house." He heard footsteps; then the sound of a "fairly loud" "thud or a slap."

---

[5]Gentry implied the reason for that chastisement had been a fear that the child would receive an electric shock from a bare electric wire. On cross-examination he said: "Q. And the reason that you slapped the child on that occasion was that you were afraid that K. would get into difficulties with this electric light cord? A. Well, *not only that, but she was disobeying what I told her.*" (Italics ours.) He stated imprints of his hand had been left on the child's face.

[6]He explained why he had gone to the C. home that night. He had lived in Placer County. He was looking for a job in the Sacramento area. He and Gentry had been friends for years. Gentry had asked Mrs. C. if Turner could stay at the C. home until he found work. Mrs. C. had consented, saying Turner could sleep on the couch.

Turner also vaguely remembered hearing a telephone call.[7]

Turner was too nearly asleep to recall either event clearly.

Later he had also partially awakened during the altercation between Mrs. C. and Gentry (see fn. 2) when Mrs. C. had come home and found her injured baby. He was still very sleepy and drifted back to sleep.[8]

During the period of Gentry's liaison with Mrs. C., Turner had been in the home several times. He, like the grandmother, had noticed on previous occasions evidences of Gentry's mistreatment of K. and of the latter's fear of Gentry.

On one such occasion, about a week before the March 27 incident, when Gentry, Turner and K. were in a basement room, Turner had witnessed the following: the baby had cried, Gentry had yelled at her and slapped her four or five times. On another occasion Turner had noticed bruises on K.'s face.[9]

Other testimony adduced by the prosecution can be discussed more suitably below in connection with appellant's contentions.

As stated, Gentry was a witness on his own behalf. He denied that he had administered the beating. He had neither seen nor heard any crying or sounds of a beating. He and Turner had gone to bed at approximately 10:30 or 11 p.m. He testified that notwithstanding the instructions of Mrs. C., Turner had not originally gone to bed on the living room couch. He, Gentry, had acceded to Turner's request that he be permitted to sleep on the top of a double bed occupied by Mrs. C.'s 3-year-old son located in the same bedroom as the crib in which the victim, K., slept. Gentry said he had placed a blanket over Turner. Gentry then went to the master bedroom and went to sleep but "somehow" he woke up. He was sick. He went to the bathroom and vomited. Then he had called Mrs. C. (See fn. 7.) Gentry's statements were conflicting as

[7]This was a telephone call made by Gentry to Mrs. C. at either 11:30 or midnight. (Both Mrs. C. and Gentry testified to this call.) Gentry had called Mrs. C., telling her he was ill. He told her to get a ride home with some one. (Gentry had her car.) He said nothing about the children.

[8]Before the officers arrived Turner was awakened again. He was still very groggy and intoxicated. He was told to leave the couch so the baby, awaiting the arrival of the ambulance, could be put there. He got up and went briefly back to a bedroom belonging to two of the older children.

[9]Regarding this he testified: "I mentioned to Al [Gentry], I said, 'It looks like you used this kid for a punching bag,' and he said, 'Yeah, that was me.' and he laughed." Turner asked Gentry why he did it. Gentry replied: "Well, I just don't like the kid, she cries all the time and I don't know why."

to the location of Turner when the phone call was made. On *direct* examination he said Turner was not then on the living room couch. He testified: "I walked . . . on the righthand side of the stereo and I didn't see Larry on the couch." But Turner had been there at the end of the call and asleep. On cross-examination Gentry testified: "Q. Do you know whether or not he was there at the time that you went out to make the phone call? A. Well, if he wasn't there, he got there awfully quick. Q. Did you ever look and see one way or the other? A. No." He had gone back to sleep and was awakened by Mrs. C. upon her return home. His version of the conversation was substantially the same as hers. He got dressed. The child was taken to the hospital. The police officers arrived. He was arrested.

He admitted having talked with Officers Tobler and Cole. He categorically denied, however, their version of the conversation.

Gentry did confirm having slapped the child on the occasion in February described by Mrs. C. His explanation was as we have stated it above. (See fn. 3.) He denied the incident in the basement room to which Turner had testified. (He also testified Turner had never been in the basement room. But on rebuttal Turner described the room minutely.) Gentry denied he had admitted to Turner that he had ever mistreated K. He denied also that he had ever mistreated K. at any time other than the one incident in February. He acknowledged, however, that his relations with the baby had not been good and that the child cried a great deal when he was present.[10]

### The Issue of Past Recollection Recorded

██ R., 8 years old, the oldest of the children of Mrs. C., testified for the prosecution. On the evening of March 26 the child, after looking at a Sunday night television program, had said good night, said her prayers and had gone to bed and to sleep. She was awakened by a noise. "It was a loud banging by feet on the floor, just like—like jumping up and down; but it was banging or something like that on the floor."

On the witness stand she was unable to remember what followed. She did remember, however, that that night after the police officers had come they had asked questions and she

---

[10]He admitted a telephone conversation with Turner on the day of the preliminary hearing in May. He affirmed that he had told Turner he was going to deny the previous (February) slapping of the child, even though it was true.

had answered those questions; also she testified that everything she had told the officers was the truth.[11]

Deputy Sheriff Ronald Tobler testified over objection to a statement made by R. The statement was written down in a report at the time or shortly after the child had related it. The statement in effect was as follows: R. had been awakened by a loud banging noise. *She had then observed Gentry coming from the victim's room* holding the victim in his arms. Gentry then closed the door leading into R.'s room. After the door was closed R. had heard further loud banging or thumping noises. The child (K) was not crying at the time.

The Attorney General's brief concedes that Evidence Code section 1237 is not applicable. It concedes too much. Section 1237 in relevant part provides that a statement previously made by a witness may be admitted without violating the hearsay rule (a) if it would have been admissible if made by him while testifying, (b) if it concerns a matter as to which the witness has insufficient present recollection, (c) if the statement is in a writing (1) made at a time when the fact was fresh in the witness' memory, (2) by the witness himself or at his direction *or by some other person for the purpose of recording the witness' statement,* (3) if offered after the witness testifies that the statement he made was a true statement of such fact, and (4) is offered after the writing is authenticated as an accurate record.[12]

---

[11]The transcript reveals the difficulties under which the child testified. Preliminary questions had been leading. The overruling of objections thereto evoked a sarcastic statement by defense counsel: ''She'll remember a lot more if he [the district attorney] puts it in her mouth.'' Counsel also made gratuitous statements to the court (and, of course, to the jury). ''It's obvious she doesn't remember a thing.'' ''The girl testified five times now she doesn't remember.'' (No such repetition occurred.) Twice the court had to admonish defense counsel not to raise his voice—''Don't start this yelling in the presence of this little child, because it only frightens her and it disturbs her.'' The judge was patient with counsel and he was fair. When substantial points in the testimony were reached, he cautioned the prosecuting attorney against leading questions. He censured the prosecuting attorney for referring to the behavior of defense counsel as ''silly.'' It was not silly; it was contemptuous. Zeal by an attorney for the defense is to be commended. His conduct in this instance was not permissible advocacy. It has left a record from which this court cannot tell whether the child actually had not remembered the further facts she had told the officers (hereafter to be related) or whether she had become too frightened by defense counsel's behavior to testify further.

[12]Subdivision (b) provides that the writing may be read, but not received, in evidence. Here it was not read although the prosecuting attorney in propounding his questions and defense counsel in cross-examination both seem to have been referring to it directly, and there are other indications in the record that the report was present in the court-

Comment of the Assembly Committee on Judiciary includes the following statement: ". . . . In addition, section 1237 permits testimony of the person who recorded the statement to be used to establish that the writing is a correct record of the statement. Sufficient assurance of the trustworthiness of the statement is provided if the declarant is available to testify that he made a true statement and if the person who recorded the statement is available to testify that he accurately recorded the statement." (Evid. Code (West's Ann.) § 1237, comment, p. 225.)

We find no respect in which the testimony of R. plus that of Officer Tobler does not fit the specifications of the section. Obviously R.'s statement would have been admissible if it had been a part of her testimony at the trial. She could not remember at the trial that she had seen Gentry carrying the child, K., nor could she remember the closing of the door or the thumps and thuds she had heard thereafter. She was available to testify and to be cross-examined at the trial. She said she had given a statement to the officer and that it was a true statement made when the event was fresh in her memory. Officer Tobler was present and testified he had taken the statement and reduced it to writing for the purpose of making an accurate record. He, too, was available for cross-examination.

We now reach the question whether *People* v. *Johnson, supra,* 68 Cal.2d 646 (see fn. 1, *supra*), should be extended to declare Evidence Code section 1237 unconstitutional as applied to a criminal prosecution. *Johnson* apparently would allow section 1235 (the statute there involved) to live as applied to evidence introduced for impeachment purposes—so long as the court carefully admonishes the jurors to "compartmentalize" their minds against truth ascertainment via the hearsay route. (Cf. *People* v. *Aranda* (1965) 63 Cal.2d 518, 525-526 [47 Cal.Rptr. 353, 407 P.2d 265]; *People* v. *Chambers* (1964) 231 Cal.App.2d 23, 33 [41 Cal.Rptr. 551], hear. den.; 82 Harv.L.Rev. 472, 477.) With section 1237, on the other hand, it probably has to be all or nothing. It would be difficult to *impeach* a witness who testifies he does not now remember a given fact but does testify he did give a statement and that whatever is contained therein is true. Section 1237

room and that defense counsel had a copy of it. In any event, no objection was made to the use of secondary evidence to prove the contents of the writing or to the manner in which it was authenticated. Absent such objection, it must be presumed that defense counsel was satisfied that the questions correctly reflected such contents.

therefore seems inevitably a method of truth ascertainment. Does it, in a criminal trial, violate the Sixth Amendment guarantee of confrontation? *Johnson* tells us that confrontation not only demands the right of cross-examination, it demands the right of cross-examination *when the statement is made*. But *Johnson*, and every authority cited with approval in *Johnson*, *is made in the context of impeaching statements*. It is no paradox that *Johnson* seemingly permits introduction of statements for impeachment purposes and at the same time strikes down impeaching statements offered as evidence of the truth of the matters stated. The two things are not the same. Assuming that the *Johnson* rule is sound as applied to impeaching (i.e., contradicting) statements, it does not follow at all that non-impeaching statements offered to prove truth should suffer the same interdiction. In *Johnson* the witnesses admitted making the statements involved but denied their truth. In the instant case, the witness both admits making the statement and reasserts its truth. Although in *Johnson* the testimony *and* the prior statement diametrically opposed to such testimony cannot both be true, thus destroying any value remaining in cross-examination, in the instant case no such obstacle exists to effective utilization of the right of confrontation at trial.

*Johnson* cites *United States* v. *De Sisto* (2d Cir. 1964) 329 F.2d 929, 932-934, and distinguishes California precedent, *People* v. *Gould* (1960) 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865], in accord with *De Sisto*. In *De Sisto* the victim of a robbery failed to make an unequivocal identification of the accused. The court in *De Sisto* upheld introduction into evidence of the witness' positive extrajudicial identification prior to trial. The court recognized that failing memory and the fact that identifications earliest in time are the most reliable are legitimate reasonable bases justifying admissibility. That is a circumstance far different from that which exists when it is established that a witness knowingly had lied at one time or another (as was the situation in *Johnson*) and when no general hypothesis can be drawn as to which statement is more likely to be reliable.[13]

---

[13]Another section of the Evidence Code (1238) specifically covers prior identifications. The statement of the child, R., which falls within section 1237 does not meet the specifications of section 1238. Subdivision (c) of that section relates to introduction of the statement ''after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time.'' Here the child was asked if she had made a statement and replied that she had and that it was true. But she was not asked if it contained an identification.

■ We hold that Evidence Code section 1237 is constitutional as applied to a criminal prosecution.

### The Issue of Prior Consistent Statements to Rehabilitate a Witness After a Charge of Recent Fabrication

■ Turner, as we have noted, had testified to two incidents which were highly damaging to Gentry. First, he had described a previous incident in which Gentry had slapped the child. Secondly, he had described a half-awake recollection during the night of March 27 of a child crying, of footsteps in the hallway, and of hearing other sounds resembling the slapping or hitting of the child.

On cross-examination defense counsel sought to impeach Turner. He brought out that later (about 11 a.m.), on the morning of March 27, Mr. and Mrs. Gentry, the parents of appellant, had taken Turner to and from a visit to the sheriff's officer where he had given a statement. Turner was asked if he had told Mrs. Gentry that he had given a statement imputing guilt to appellant through fear that he, Turner, would be sent to prison if he did not. Turner admitted that was correct.[14]

Also brought out on cross-examination was the fact that Turner had not mentioned to Deputy Sheriff Cole, who was the first officer to question Turner after discovery of the beating, anything inculpating Gentry.

The purpose of both lines of cross-examination was, of course, to prove that Turner's testimony implicating Gentry was fabrication.

On redirect examination Turner explained the answers given on direct examination. His statement to Mrs. Gentry, he testified, was not a fear of being sent to jail for child beating but, if he withheld what he knew, of being charged as Gentry's accessory. As regards his failure to disclose to Officer Cole what he subsequently had told the other officers, he explained this was due to his groggy and sleepy condition.[15]

---

[14] I told them that I had said that I saw Al [Gentry] slap the baby before; and so Mrs. Gentry says, 'Oh, boy, now you've done it, they're going to get him for sure.' So I said—I said, 'Well, I had to tell them or they were going to put me in jail.'"

[15] "At the time that Sergeant Cole came to the house I had just awakened, I was groggy, I didn't even know what was happening at the time and nothing had registered yet. I was half asleep when I was talking to him. All—I just kept trying to lay back on the couch and go back to sleep when the officers were there. . . . Were you consciously withholding something from Sergeant Cole? A. No I wasn't."

The prosecution then offered Deputy Sheriff Drennon and statement reporter Gainsley as rehabilitation witnesses. Both testified that Turner, on the morning of March 27, had made statements to Drennon, transcribed by Gainsley (and read in evidence) which were in substance the same as Turner's testimony. (There was no objection made to Gainsley's testimony.)

Prior statements consistent with testimony are, as an exception to the hearsay rule, admitted for the purpose of rehabilitation following an attempt to impeach the testimony. (*People* v. *Duvall* (1968) 262 Cal.App.2d 417, 420-421 [68 Cal.Rptr. 708], hear. den.; Evid. Code, § 1236.) If, however, the consistent statement was made *after* an improper motive is alleged to have arisen, the statement is inadmissible. (*People* v. *Doetschman* (1945) 69 Cal.App.2d 486 [159 P.2d 418].) The Evidence Code codifies this rule. (Evid. Code, § 791, subd. (b); and see comment to that subdivision, Law Revision Com.) The reason for this limitation is that when there is a contradiction between the testimony of two witnesses it cannot help the trier of fact in deciding between them merely to show that one of the witnesses has asserted the same thing previously. "If that were an argument, then the witness who had repeated his story to the greatest number of people would be the most credible." (4 Wigmore, Evidence (3d ed.) § 1127, p. 202.) Dean Wigmore also speaks of an accomplice (and the same rule would apply to an *alleged* accomplice). Such a witness, he says, is nearly always under suspicion of discredit due to improper motives (or alleged improper motives) at the very outset. Therefore it is rare that rehabilitation could ever result from showing his prior consistent statement. (*Id.,* § 1128, pp. 203-205.) But there is an exception to the limitation. Different considerations come into play when a charge of recent fabrication is made *by negative evidence* that the witness did not speak of the matter before when it would have been natural to speak. His silence then is urged as inconsistent with his utterances at the trial. The evidence of consistent statements at that point becomes proper because "the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story." (*Id.,* § 1129, p. 205.)[16] Turner testified that the statement to Officer

[16]Dean Wigmore ( *id.,* § 1129, p. 205) gives an illustration taken from the venerable case, *Hewitt* v. *Corey* (1890) 150 Mass. 445 [23 N.E. 223].

Cole had been made when he was groggy and half asleep; that he had made a full statement to sheriff's officers of what he knew relevant to the case at the earliest opportunity after he had recovered his senses. The explanation was corroborated by one of the officers to whom the statement had been made and by the statement reporter who had recorded the statement. *People* v. *Duvall, supra,* 262 Cal.App.2d at page 420, footnote 1, notes that California is one of the most liberal states as far as the admission of prior consistent statements is concerned, citing *People* v. *Hardenbrook* (1957) 48 Cal.2d 345, 351 [309 P.2d 424], and *People* v. *Walsh* (1956) 47 Cal.2d 36, 41 [301 P.2d 247]. *Duvall* states (at p. 421) : ". . . However, that there was always present a questionable motive to fabricate should not deprive the prosecution of its right to show that another motive, clearly established by the evidence, did not affect the witnesses' stories." Here (as the defense had been at pains to show and Turner had admitted), Turner was quite intoxicated when he went to bed and had had to be shaken when he was awakened. This was shortly before Officer Cole had questioned him.

### The Issue of Application of the "Necessarily Included Offense" Doctrine

Gentry contends that a requested instruction allowing the jury to find him guilty of a misdemeanor violation of Penal Code section 273a, subdivision (2), should have been given. The section proscribes wilfully causing or permitting a child to suffer pain "under circumstances or conditions other than those likely to produce great bodily harm or death." The argument is that since the information charged that the crime was committed "on or about" March 27, 1967, it could have been applied to the incident admitted by Gentry which occurred in February when he slapped the child. There is no merit to the contention. There was no doubt at the trial as to the incident with which defendant was charged. It was patent he was not being tried for the February slapping. Appellant

---

A married woman sued a sheriff for wrongful attachment of a horse. Attachment had been levied on the theory that the horse was the property of the husband. The husband testified that he was not the owner. To discredit his testimony it was shown on cross-examination that the horse had been listed among property mortgaged by him. The husband then testified that inclusion of the horse as part of the property mortgaged was inadverent and that as soon as the mistake was discovered that item had been stricken from the mortgage. The court permitted the mortgagee to testify corrobating that statement. It was held that the mortgagee's rehabilitating statement was admissible.

cites *People* v. *Garcia* (1967) 250 Cal.App.2d 15 [58 Cal.Rptr. 186], which holds that failure to instruct on a necessarily included offense is error. The crime charged here is the opposite of the crime defined by Penal Code section 273a, subdivision (2). The child victim here was beaten almost to the point of death.

Equally without merit is the argument that the jury reasonably could have found him guilty of a violation of Penal Code section 273a, subdivision (2), for having permitted Larry Turner to sleep in the same bedroom with the infant.

It has been held that irrespective of how tenuous a defense theory may be, it is the duty of the trial judge to give an instruction based thereon. (*People* v. *Jeter* (1964) 60 Cal.2d 671, 674 [36 Cal.Rptr. 323, 388 P.2d 355].) Here, however, Gentry was not accused of having permitted the child to be left with an unsuitable person; he was accused of beating the child. Moreover, even assuming the fact testified to by Gentry to be true, it could not legally have supported a conviction under section 273a, subdivision (2).

### The Miscarriage of Justice Issue

 Under this caption we assume, contrary to our holding, that error was committed under the rule of *People* v. *Johnson, supra,* 68 Cal.2d 646, by admitting evidence of the statement of the child R. If such was error, it was of United States constitutional dimensions. That would require that in applying the "miscarriage of justice" rule of California Constitution article VI, section 13, the question of prejudice must meet the test of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. That test is: " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " (*Chapman* v. *California, supra,* p. 710 [17 L.Ed. 2d].) It is stated in another way: "[T]he beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (P. 710 [17 L.Ed.2d].)

 It is pointed out that the jury in this case deliberated for eight hours. That merely indicates a conscientious jury carefully considering a complicated factual situation. (We have pondered over the record a great many more days than the jury did hours.) In applying the *Chapman* test we first consider what contribution the asserted "inadmissible" evidence made in the chain of proof. The statement was by a

little girl. Only her identification (if accurate) had importance. The fact that the baby was crying and a man was seen and that sounds were heard restates already known evidence. There was no evidence the area was lighted.[17] An identification made by a sleepy child of a man in a darkened place during a second of time has little, if any, probative value. Still bearing in mind that K. was certainly beaten and that either Gentry or Turner was the guilty person, we turn to the proof of Turner's guilt. It rests upon a happenstance of his presence in the home and an uncorroborated story by Gentry.[18] Moreover, Turner had no motive to molest K. Even as Gentry tells the story, Turner in his previous contacts with the child had been gentle with her. That was particularly true when on the evening of March 26 he had taken the child from Gentry, had held her until she had become sleepy again and had put her back in her crib. There was no evidence in the case of any innate streak of cruelty in young Turner. On the other hand the evidence of Gentry's guilt both from the direct evidence of the events of the evening, by his admissions to the officers, by testimony admitting his intention to lie to the officers (see fn. 10) and by the repeated instances of past brutal behavior was overwhelming. In addition, there is the attempt by Gentry to fix blame upon Turner by trying to "place" him in the victim's bedroom at a time when the beating might have taken place—this through the bizarre account of an unauthorized sleeping arrangement whereby Turner assertedly was assigned to occupy (the top of) the bed of a 3-year-old child (but admittedly was somehow sound asleep on the couch in another room when a phone call was made 30 minutes or so after Gentry and Turner had retired).

While the *Chapman* test is a severe one, we are not required to assume that the jury was wholly without intelligence. Although our Supreme Court has stated (quoting) in another context that sometimes " [w]e treat . . . [jurors] '. . . . as a group of lowgrade morons and at other times as men endowed

---

[17]The hall light was off when Mrs. C. arrived home. She testified: "I heard a funny noise from the baby's room. So I immediately went in there and I flipped on the hall light. . . ."

[18]Corroboration of that story is argued from the fact that when Turner had talked to Officer Cole he told him he had been sleeping in one of the bedrooms at the time when Mrs. D., the baby's grandmother, had arrived. That statement merely accords with Turner's testimony. He said he had been shaken and awakened when he was on the couch in the living room. He had been required to move so that the injured baby would be laid on the couch. He had been told to and did remove himself to the bedroom of the two older children who had apparently gotten up. He had gone back to sleep in their bedroom.

with a superhuman ability to control their emotions and intellects' " (*People* v. *Aranda, supra,* 63 Cal.2d 518, 526), here we do not think we should be required to reach either extreme. The evidence, we believe, abundantly supports our view—beyond all reasonable doubt—that no jury could reasonably have reached a verdict of not guilty.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied April 1, 1969.