[No. B152020. Second Dist., Div. Two. Oct. 8, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
GIOVANNI CHRISTOPHER WILLIAMS, Defendant and Appellant.

---

COUNSEL

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Susan Sullivan Pithey, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**BOREN, P. J.**—A jury convicted appellant, Giovanni Christopher Williams, of assault, robbery, making criminal threats, child abuse and assault with a deadly weapon. The jury also found true several weapons and prior conviction enhancements. The trial court sentenced appellant to 17 years in state prison.

Contrary to appellant's contention, he was not denied his rights to confront witnesses, to be present at trial and to due process when the trial court

allowed the adult prosecuting witness, who suffered from established physical and mental disabilities, to testify at trial by means of a prior videotaped recording. The videotape played for the jury was recorded while the witness was in the courtroom and examined and cross-examined by counsel, and while appellant was in a detention cell wired so he could hear the witness's testimony. Also, the trial court properly admitted into evidence and played for the jury the videotaped recording of a police interview of the prosecuting witnesses. The recording was admissible as a prior consistent statement (Evid. Code, §§ 1236, 791, subd. (b)) and not unduly prejudicial (Evid. Code, § 352).

FACTS

1. *Prosecution Evidence*

 a. *Testimony of Adam Chamberlin*

Adam Chamberlin had known appellant for about two or three years before October 2, 1999—ever since appellant's relationship with his mother, Dawn, began. Adam lived with his mother, brother, and a disabled man named Duncan in an apartment in Lancaster. The Chamberlins were Duncan's caretakers. Adam was 15 years old at the time of trial. On October 2, Adam's brother Anthony, who was 17 or 18 years old, went with appellant to the mall. Appellant was living "off and on" with the Chamberlins, although his belongings were at a home owned by Dawn on San Francisco Avenue. Dawn had lupus, arthritis, and other ailments that made it difficult for her to get around. On October 2, Dawn was worried because Anthony did not answer her pages. After Anthony finally telephoned and Dawn spoke with him, she called Adam's father Larry and asked him to take her and Adam to the mall to get Dawn's van. Anthony came out of the mall to meet them. Appellant soon followed and was "acting drunk."

Dawn told appellant not to return to her apartment. Appellant was angry and cursed at Dawn. Dawn offered appellant a ride to anywhere but her apartment. Dawn left with Adam, and Anthony and his father went elsewhere.

On arriving at the apartment, Dawn told Duncan to get dressed and go out to the van because there was a problem. Duncan got in the van with Adam. Upon leaving, Dawn inadvertently locked all of her keys, including the van keys, in the house. She had Adam page his father from the apartment of a neighbor, Mark Hover. While Dawn, Adam and Duncan sat in the van and waited for a response, appellant appeared. Adam was afraid appellant would

"do something" because he had been drinking. Appellant was violent when drunk and even when not drunk.

Appellant said, "What are you guys doing? You guys are up to something. You guys are up to no good." Appellant began banging on the car and shaking the car window next to Dawn, which was halfway open. Appellant reached in and tried to grab Dawn but succeeded only in grabbing her shirt. He moved to the other side and grabbed Adam. Adam told appellant to leave them alone. When appellant began telling Duncan he would kick Duncan's ass, Dawn, who was five feet two inches tall and weighed over 200 pounds, ran to her next-door neighbors' and knocked on the door, asking them to call the police. She received no response. She asked appellant to leave, and appellant said he had nowhere to go and no money. He said, "Bitch, better give me some money." Appellant told Dawn he would beat her before the police got there, beat her when they got there and give her a reason to call the police.

Adam saw appellant sprint toward his mother, and he hopped out of the van. When he got to appellant and his mother, appellant was on top of his mother, who was lying on her stomach. Appellant was banging her head against the ground. Dawn was protecting her face with her arms. Adam began hitting and kicking appellant, and appellant rose and tried to hit Adam. Adam ran away as his mother was trying to get up. Appellant straddled her again and tried to hit her face into the concrete. Adam ran back and hit and kicked appellant again. Appellant threw a rock at Adam, which missed his face and struck his right hand. Dawn got up and began hitting the neighbors' door again. When the neighbors opened the door, Dawn asked them to call the police because her family was in danger. Adam heard one of them say they were going to call the police. At that point, Mark Hover, who lived in an upstairs apartment, came out. Dawn gave appellant some money, but he complained it was not enough. Appellant found more money in Dawn's purse and took it. Appellant ran off, and Hover called the police. Dawn, Adam and Duncan went to Hover's apartment. Dawn suffered scrapes and a chipped tooth.

After being arrested, appellant made many collect calls to the Chamberlin home. Adam did not accept them. Appellant tried to get the Chamberlins to change their story. Dawn spoke with appellant. Appellant alternately cried, got angry and apologized.

b. *Testimony of Dawn Chamberlin*

Dawn testified that appellant was her ex-boyfriend. He lived in her house—one in which she did not live at the time. On the day Anthony and

appellant went to the mall, Dawn paged them several times. She was concerned that appellant might be drinking because he had been recently paid. Anthony finally returned her pages at 7:00 or 8:00 p.m. Dawn spoke to appellant over the telephone and realized he had been drinking. She told Anthony to get the van keys from appellant and asked her estranged husband, Larry, to drive her to the mall to pick up the van and Anthony. After Anthony came out of the mall and over to the van, Anthony and Larry went to a laundromat and Dawn and Adam went straight home.

Upon arriving home, Dawn made Duncan come out to the van so they could all leave. However, Dawn inadvertently locked the van keys in the house and locked herself out. Adam went to Mark Hover's apartment to page Larry, and they all sat in the van. Appellant appeared, foaming at the mouth. He started beating on the van and saying Dawn was up to something. He was calling her names. Appellant went around to the passenger side of the van and grabbed Adam's T-shirt and told him he was going to beat his ass. Dawn said, "No, please don't hurt my son," jumped out of the van and ran to knock at her neighbors' door. She asked them to call the police. They did not respond.

Dawn went back toward appellant, whereupon appellant grabbed her very hard and she fell onto the cement sidewalk. She hit the building wall on the way down and chipped a tooth. Appellant straddled her back while she was lying on her stomach. He grabbed her braids and pulled her head back and repeatedly pushed her face to the cement. She protected her face with her arms. Appellant yelled obscene threats and said he would beat her until the police got there and while the police were there. She was afraid because he had choked her before and knocked her to the floor. Adam kicked and hit appellant. Appellant got off Dawn and ran after Adam. Dawn saw that appellant had a huge rock. Appellant straddled her again, holding the rock. Adam began to kick appellant, and appellant ran after Adam again. Dawn managed to get up and knock at the neighbors' door again. They opened the door, and she asked them to call 911.

At one point, Mark Hover yelled down and asked what was happening. Dawn and Adam asked Hover to call 911 and appellant ran away. Dawn said that appellant had told her that if she gave him some money he would leave. She gave him about $50 because she was afraid he would hurt her and her son. Appellant demanded more money, and she found more and gave it to him.

Appellant returned the same night and banged on Dawn's door. He got on the balcony and threatened to smash the sliding glass door and hurt all of them. She called 911.

During September 2000, appellant made many collect telephone calls to Dawn from county jail. She accepted the calls because she was afraid he would hurt her and her family if she did not. At first he tried to reason with her and apologize, and then he became more threatening. He asked her not to testify. He told her to say she had given him the money. He said he would get out one day and she had better watch her back. She believed he would hurt her and was afraid while on the witness stand.

Dawn acknowledged on cross-examination that, after the incident, she did not call the police and tell them appellant was staying in her other house. She gave appellant money through her son because appellant threatened her. She acknowledged that she spoke very often with appellant on the telephone when he was in jail. One call was 90 minutes, and most were more than half an hour. She did not tell appellant to get in the van at the mall. She offered to give him a ride somewhere but not to their home. She denied appellant had given her any money on the day before the incident.

c. *Testimony of Mark Hover*

Mark Hover met appellant on October 1, 1999, when he gave appellant a ride to work at Adam's request. On October 2, at approximately 9:45 p.m., Hover heard yelling downstairs. In a defensive tone, a female voice said, "Stop. Don't." When Hover heard the sound of a body or a fist hitting a wall, and louder screaming, he went outside. He saw Dawn lying on the ground and appellant standing above her, kicking and striking her. Hover told his girlfriend to call the police, but he did not go downstairs because he was afraid of appellant. Dawn and Adam pleaded with appellant to stop and not hurt Dawn. Hover heard appellant say, "Give me the money, bitch. My homies are coming." Dawn handed appellant some money. Appellant then left. Hover went downstairs, and Dawn thanked him for "saving" her. Adam told Hover he had thrown rocks at appellant, but Hover was not clear whether Adam said the reverse had happened. Adam showed Hover the red marks on his back, stomach and arms. Adam's right hand hurt, and Hover gave him some ice. Adam's shirt was torn.

d. *Other prosecution evidence*

Deputy Roman Castillo responded to the domestic violence call. He found Dawn crying and upset. She told Castillo her "ex" had assaulted her during an argument. He had also demanded money. She complained of an abrasion to her arm. Dawn said that Adam had gotten into a scuffle with appellant. Adam was also scared and crying.

Castillo explained that Lancaster patrol deputies do the initial investigation of domestic violence calls. Subsequently, a team called STOP, for "Safety Through Our Perseverance," investigates further.

David Shoemaker, a deputy sheriff assigned to the family crimes bureau's STOP team, videotapes interviews of domestic violence victims, usually within 48 hours after an incident. On September 28, 2000, Deputy Shoemaker interviewed Dawn at the People's request. Ill health prevented Dawn from responding to the first two requests for an interview. When the interview took place, Dawn had difficulty moving around. Dawn told Deputy Shoemaker she was appellant's ex-girlfriend. She indicated to the deputy that she was still fearful of appellant, almost a year after the incident. Deputy Shoemaker also interviewed Adam. The videotape was played to the jury. Deputy Shoemaker found no major inconsistencies between the September 2000 interview and Dawn's testimony during trial.

### 2. Defense Evidence

Appellant testified on his own behalf. According to appellant, when he arrived at the apartment, he saw Dawn and Adam in the van. Appellant and Dawn argued about whether appellant would stay at the apartment. Dawn at one point bolted out of the van, banged on the neighbors' door and yelled to call the police. Appellant approached Dawn, who told him she did not want him in the house. He told her he needed money to get a room, and he reminded her that he had given her $100 the night before and spent money on her van. She returned to the van for her purse and then gave appellant about $30.

Appellant denied yelling at Dawn and asking her for more money. Appellant claimed he never straddled Dawn and tried to hit her face in the cement. He never pushed her or struggled with Adam. He did not see or hear Mark Hover that day. Appellant also asserted he did not return to Dawn's and jump on the balcony.

When appellant contacted Dawn a few days later, she told him he was in trouble because the police wanted him for robbery. Appellant stayed at Dawn's other home on San Francisco Avenue, and she sent him his belongings, money and food because he had lost his job by then.

Appellant stayed at the San Francisco Avenue home for up to two months and then went to Mississippi for a job opportunity. He and Dawn were in constant telephone contact after Dawn contacted appellant's family. He never threatened Dawn to dissuade her from cooperating with the prosecution.

Appellant wrote romantic letters to Dawn after he was in custody. Between September 21 and September 28, 2000, Dawn accepted calls from

appellant, who was in county jail, every day. The average call was 50 minutes. Dawn found out that he had affairs with other women while in Mississippi.

Appellant denied threatening Dawn and denied that the letters in the People's exhibit No. 4 were written by him. Any apologies in the letters were for having affairs, not for the events of October 2, 1999.

The jury heard a tape of appellant making a threatening telephone call to Dawn. The telephone calls led to appellant's conviction in 1998. Appellant denied it was his voice on the tape.

### 3. *Rebuttal Evidence*

Dawn's son Antoine, whom she called Anthony, testified that he went with appellant when appellant said he wanted to get a haircut, but it was not a ritual. He and appellant did not go together to visit a woman. They went to the mall to fill out job applications, and appellant had one interview. Dawn told Anthony to get the keys from appellant because she believed appellant was drunk. Appellant reluctantly gave the keys to Anthony, who went outside and met his mother.

Appellant appeared in the parking lot and was upset. He was yelling and foaming at the mouth. When Anthony and his father arrived at Dawn's that evening, Dawn was upset and Adam was angry. Adam said his hand was injured. Dawn was bleeding from the mouth and her shirt was ripped. Appellant returned to the residence later that night. He screamed at them and banged on the windows and the sliding glass door.

Appellant was allowed to move into the San Francisco Avenue house because of his threats to the family. It was because of the threats that Dawn gave appellant money.

Anthony taped a threatening telephone call from appellant in 1998. Appellant's threats led to prosecution and conviction for a violation of Penal Code section 422, making terrorist threats. He was sent to prison. Appellant was paroled to the San Francisco Avenue address. Dawn allowed him to stay there because he threatened her.

DISCUSSION

### I. *Videotaped Testimony of Complaining Witness*

#### A. *Appellant's Argument*

Appellant argues that the manner in which Dawn Chamberlin was permitted to testify violated his right of confrontation contained in the United

States and California Constitutions. He also claims the procedure violated his right to be personally present at trial and his right to due process. Appellant maintains that the error was not harmless.

B. *Proceedings Below*

The prosecutor told the court before trial that, in lieu of calling Dawn to the stand, she would seek to have Dawn's videotaped statement from September 2000 used as her testimony at trial pursuant to Evidence Code section 1370.[1] The trial court conducted a hearing to determine whether Dawn was unavailable as required by Evidence Code section 240. Rather than find that Dawn was unavailable and admit the September 2000 video-taped statement, the trial court ordered that Dawn be examined out of the presence of the jury and of appellant.

At the hearing, Dr. Richard Ellsworth testified that he had been Dawn's treating psychotherapist for seven years. He had treated her within the last two to three years for posttraumatic stress and major depressive disorder. Dr. Ellsworth became aware approximately four or five years earlier that Dawn had been a victim of domestic violence. He stated that battered women almost always suffer posttraumatic stress.

Dr. Ellsworth said that Dawn had a very strong fear reaction when she talked about "the domestic violence," and she was "unable to get her mind off of it." Dawn repeated the events of the abuse over and over and was unable to think about anything else. She would begin crying and eventually get to the point of hopelessness and helplessness. Dr. Ellsworth said that, for his patients who reached this point, it was a "very short step from there to suicidology." He stated that Dawn had expressed a lot of "hopelessness and helplessness," and that was something that could potentially lead to suicide.

Dr. Ellsworth was often in communication with Dawn's physicians and was aware of her lupus condition. He was also aware she had some seizure problems. He stated that he had gleaned from speaking with Dawn that she has very few good days. Sometimes she required help to get from her bed to

---

[1] Evidence Code section 1370 states in pertinent part: "(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to Section 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

the bathroom, and on other days she was able to leave the house, although she had not done so often in the past six or eight months.

As the trial date approached, Dr. Ellsworth noticed a change in Dawn's condition. She had been in a state of panic for approximately six weeks. She was very afraid that she would have to face appellant. Appellant had telephoned Dawn numerous times, and Dawn was more fearful and more panicked and anxious after the telephone calls.

In Dr. Ellsworth's opinion, Dawn would not be able to testify in the courtroom situation where all parties were present. The panic, anxiety and fear would overwhelm her. These psychological factors would probably also exacerbate her medical condition. He stated, "I don't think that she would be able to think very clearly at all because of the anxiety and her fear. Therefore I don't think that what she would say would even make sense, let alone be accurate." On the one occasion appellant was with Dawn in Dr. Ellsworth's office, Dawn did not speak as freely. She spent most of the time looking at appellant and was evasive when Dr. Ellsworth asked her questions.

When asked if, in his opinion, it would be greatly detrimental to Dawn to testify at trial under the usual circumstances, Dr. Ellsworth replied that it would. Although other domestic violence victims would find it stressful to testify in court against their accusers, Dawn had a much stronger panic reaction than most and more severe medical disorders that interacted with her psychological disorder. The result would be panic and anxiety and an inability to think clearly. Her testimony would not be reliable if appellant were present. If Dawn testified in the presence of appellant, she would very likely become suicidal and would need to be hospitalized in a mental health unit, which would be difficult because of her medical condition. He stated it would be impossible for Dawn to testify if appellant were present. He believed Dawn could testify in a deposition format in her home.

Dr. John William Birsner is Dawn's gynecologist and primary care physician. He had also attempted to treat her depression during the last few years. He prescribed pharmaceuticals, including antidepressants, for Dawn. As recently as four months earlier, Dawn had told Dr. Birsner that the stress of the court proceedings and the trauma she suffered from the domestic violence relationship had adversely affected her lupus. Her mental condition deteriorated, and she was less able to function.

Dr. Birsner did not believe Dawn would be able to function on the witness stand at trial. She would be "a basket case." Between her psychiatric and physical ailments she was minimally functional. Dawn had made allusions to

Dr. Birsner of wanting to commit suicide on a number of occasions. She indicated it was an alternative to enduring the wear and tear of the legal proceedings. He believed this was a cry for help and an expression of the duress she felt.

When asked if Dawn would be able to testify if appellant were not present, Dr. Birsner's reply was "a guarded yes." Dr. Birsner did not believe Dawn was physically unable to come to court, but mentally she was so ill she could not testify in court. She could testify outside the presence of appellant, however.

Following the testimony and argument, the court stated that it took the right of confrontation and the right to cross-examine very seriously. The court believed that Dawn would be deemed unavailable only if appellant were in the courtroom. The court sought to accommodate both the witness and the defense by bringing Dawn into the courtroom and videotaping her during her direct testimony and cross-examination.

The videotaping took place as directed by the trial court. Appellant remained in a detention cell, which was wired so that he could hear Dawn's testimony. Defense counsel was able to go to the detention cell and confer with appellant before ending his cross-examination. The videotape was thereafter played for the jury with appellant present in the courtroom. The jury was not permitted to know that the witness was unable to testify in front of appellant.

### C. Trial Court's Procedure Was Proper Under the Circumstances

 We conclude that, given the testimony of Dawn's psychotherapist and physician, the trial court did not err in arranging for Dawn to testify without defendant present.

 "In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.' [Citations.] 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' *Maryland* v. *Craig*, 497 U.S. 836, 845 [110 S.Ct. 3157, 3163, 111 L.Ed.2d 666] (1990)." (*Lilly* v. *Virginia* (1999) 527 U.S. 116, 123-124 [119 S.Ct. 1887, 1893-1894, 144 L.Ed.2d 117].)

"We have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (*Maryland v. Craig, supra,* 497 U.S. 836, 844

[110 S.Ct. 3157, 3162-3163].) In *Maryland v. Craig,* the court upheld a Maryland statute detailing a procedure for receiving the testimony of child witnesses. The statute allowed the child to testify and be cross-examined in a separate room while the judge, jury and defendant remained in the court-room. (*Id.* at p. 841 [110 S.Ct. at p. 3161].) A video monitor would allow those in the courtroom to see and hear the witness's testimony. (*Ibid.*)

*Maryland v. Craig* distinguished the case before it from *Coy v. Iowa* (1988) 487 U.S. 1012 [108 S.Ct. 2798, 101 L.Ed.2d 857], in which the arrangement of having child witnesses hidden from the defendant by a screen was deemed to violate the defendant's right to face-to-face confrontation. (*Coy v. Iowa, supra,* at pp. 1014-1015, 1020 [108 S.Ct. at pp. 2799-2800, 2802-2803].) The *Maryland v. Craig* court noted that in *Coy v. Iowa,* no individualized findings that the witnesses needed special protection were made. (*Maryland v. Craig, supra,* 497 U.S. at p. 845 [110 S.Ct. at p. 3163].) In *Maryland v. Craig,* however, "[b]ecause the trial court in this case made individualized findings that each of the child witnesses needed special protection, this case requires us to decide the question reserved in *Coy.*" (*Ibid.*) That question was whether any exceptions exist to the right to meet face to face all of those who give evidence at trial. (*Id.* at p. 844 [110 S.Ct. at pp. 3162-3163].) The court reasoned that "[a]lthough face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' [citation], we have nevertheless recognized that it is not the *sine qua non* of the confrontation right. [Citations.]." (*Id.* at p. 847 [110 S.Ct. at p. 3164].)

After reviewing the cases of precedential value, the court concluded that the confrontation clause reflects a *preference* for face-to-face confrontation at trial that must at times yield to public policy considerations and the " 'necessities of the case.' " (*Maryland v. Craig, supra,* 497 U.S. at p. 849 [110 S.Ct. at p. 3165.) "Thus, though we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." (*Id.* at pp. 849-850 [110 S.Ct. at pp. 3165-3166].) The court added that there must be a showing that the denial of the confrontation right is required to further an important public policy and that the reliability of the testimony is otherwise assured. (*Id.* at p. 850 [110 S.Ct. at p. 3166].)

Although *Maryland v. Craig* was a child witness case, we believe the principles it discusses apply here. In the instant case, Dawn's testimony was sufficiently corroborated to ensure its reliability. Furthermore, as in *Maryland v. Craig, supra,* 497 U.S. 836, the other elements of the confrontation right, i.e., the oath, opportunity to cross-examine and the ability to

observe the witness's demeanor, allowed Dawn's testimony to be tested in a manner functionally equivalent to giving live testimony. (*Id*. at p. 851 [110 S.Ct. at pp. 3166-3167].) The necessity for the accommodation was clear. The court was properly concerned for the well-being of Dawn after hearing testimony from her treating psychotherapist and physician that it was impossible for her to testify in the presence of appellant without suffering dangerous ill effects, both mental and physical.

Such psychiatric testimony was lacking in the case of *Hochheiser v. Superior Court* (1984) 161 Cal.App.3d 777 [208 Cal.Rptr. 273], cited by appellant and defense counsel below. In *Hochheiser*, the court granted the petitioner's writ of prohibition, concluding that the trial court had exceeded its authority by departing from established criminal trial procedures. (*Id*. at p. 780.) The trial court was precluded from enforcing its order that allowed for the taking of the child victims' testimony by means of closed-circuit television from the jury room. (*Id*. at pp. 780-781.) The witnesses' parents testified in support of the prosecution motion for the televised testimony, but no psychiatric evidence was offered. (*Id*. at p. 781.) The lack of such testimony was noted by the reviewing court, and it concluded that expert testimony or the witness's own testimony about the witness's mental health was required. (*Id*. at pp. 793-794.)

Given the categorical warnings by Dawn's psychotherapist and physician of the effects of confrontation upon her, the need to take measures to protect her was apparent. The public policy of protecting abuse victims and making their testimony or statements available to the trier of fact is manifested in Evidence Code section 1370, which allows certain prior statements of abuse victims to be admitted into evidence when the victim is unavailable under Evidence Code section 240. Here, the videotape allowed the jury to see Dawn's demeanor on the witness stand, facing defense counsel and in the presence of the trial judge. Although it may have been preferable for the trial court to have explored the use of a support person pursuant to Penal Code section 868.5,[2] given the uncompromising nature of the expert testimony, it is unlikely the use of a support person would have been sufficient to protect Dawn from the grave harm predicted by her psychotherapist and physician. Moreover, the court had to take into consideration Dr. Ellsworth's statement that Dawn's testimony would likely be inaccurate if she were obliged to testify in front of appellant.

Our rejection of appellant's confrontation clause claim applies equally to his claims regarding violations of his right to be present and due

---

[2]Penal Code section 868.5, subdivision (a), allows a prosecuting witness in certain cases, including those involving assault with a deadly weapon, to have up to two support persons in attendance at trial during the prosecuting witness's testimony.

process rights. ██ "A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code." (*People v. Waidla* (2000) 22 Cal.4th 690, 741 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The effect of a defendant's exclusion from a proceeding should be considered in light of the whole record. (*United States v. Gagnon* (1985) 470 U.S. 522, 526-527 [105 S.Ct. 1482, 1484-1485, 84 L.Ed.2d 486], citing *Snyder v. Massachusetts* (1934) 291 U.S. 97, 115 [54 S.Ct. 330, 335-336, 78 L.Ed. 674, 90 A.L.R. 575].)

██ Given the evidence of Dawn's mental state, appellant and Dawn could not be in the same room while she gave testimony. According to Dr. Ellsworth, requiring Dawn to testify in appellant's presence would actually be counterproductive to ascertainment of the truth. (See *United States v. Gagnon, supra,* 470 U.S. at p. 527 [105 S.Ct. at pp. 1484-1485].) The procedure implemented by the trial court enabled appellant to be present when Dawn's testimony was heard by the trier of fact, and it afforded appellant the opportunity to confer with his counsel. (See *Illinois v. Allen* (1970) 397 U.S. 337, 344 [90 S.Ct. 1057, 1061, 25 L.Ed.2d 353.)

Contrary to appellant's assertion, the procedure used in this case did not violate due process by indicating to the jury that appellant was guilty. The jury heard ample evidence regarding Dawn's physical and mental afflictions, and it likely believed her infirmity was the reason for the videotaped testimony. The procedure as to Dawn's testimony did not point to appellant's guilt. Rather, the record as a whole, including the witnesses who corroborated Dawn's testimony, established appellant's guilt. Adam and Mark Hover both described the conduct with which appellant was charged. The testimony of Anthony and Larry also supported Dawn's version of events and discredited appellant's story. Moreover, the trial court instructed the jury not to speculate on the reason for the videotaped testimony.[3]

Accordingly, the procedure implemented by the trial court did not render the trial "so fundamentally unfair as to signify a due process violation." (*People v. Reyes* (1989) 212 Cal.App.3d 852, 857 [260 Cal.Rptr. 846].) Indeed, the procedure appropriately accommodated both appellant's constitutional rights and the legitimate and well-established physical and mental disabilities of the victim.

---

[3]The court told the jury that "the testimony of the next witness you will hear by videotape. You're not to speculate as to why you're receiving this testimony by video. It is testimony given under oath. [¶] It is to be treated the same as any other testimony as given by any other witness given in court."

## II. *Admission of the Videotaped Police Interview of Two Prosecuting Witnesses*

### A. *Proceedings Below*

After the cross-examination of Dawn and Adam, the prosecutor sought to introduce the videotape of Deputy Shoemaker's interview of these two witnesses. The prosecutor argued that the videotape contained prior consistent statements by the witnesses that were admissible under Evidence Code section 791, subdivision (b), to rehabilitate the witnesses.[4] The videotaped interview took place approximately one year after the commission of the offense, and it was done at the request of the prosecution. The prosecution also planned to call Deputy Shoemaker to the stand.

During argument, defense counsel conceded that the September 2000 statement appeared to be consistent with the trial testimony. Defense counsel argued, however, that admission of the videotape would violate Evidence Code section 352 because it would be more prejudicial than probative. Defense counsel argued that Deputy Shoemaker could testify to the consistent statements. The court allowed the videotape to be played during the deputy's testimony.

### B. *Appellant's Argument*

■ Appellant contends the trial court prejudicially erred in allowing the jury to see the videotape of the interview of Dawn and Adam, and in admitting that tape into evidence. Appellant argues that the statements in the videotape were hearsay and inadmissible in the absence of an exception. He maintains that the statements were not admissible under Evidence Code section 791, subdivision (a), because the so-called inconsistent statements were made during questioning by Officer Castillo on October 2, 1999, and the consistent statements were made almost a year later, on September 28, 2000. Evidence Code section 791, subdivision (b), requires that the charge of fabrication be one of recent fabrication, and that the statement sought to be admitted be made before the motive for fabrication is alleged to have arisen. Here, appellant argues, there was no charge of recent fabrication and no

---

[4]Evidence Code section 791 states: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

showing that the videotaped statements were made before the motive for fabrications allegedly arose. Also, the evidence was inadmissible under Evidence Code section 352 because it allowed the prosecution to present its case-in-chief a second time without cross-examination. Therefore, appellant contends, it is reasonably probable that a result more favorable to appellant would have occurred in the absence of the erroneous admission of the videotape. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

C. *Videotape Properly Admitted*

Contrary to appellant's assertions, the videotaped interview was admissible under Evidence Code sections 1236 and 791, subdivision (b). Evidence Code section 1236 states that "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

In the instant case, defense counsel implied during cross-examination that both Dawn and Adam had fabricated portions of their trial testimony. Defense counsel questioned Dawn about sending money to appellant while he was in custody. He implied that Dawn's alleged motive for sending the money—threats from appellant—was untrue by asking her if the only reason she stopped sending money to appellant was because she found out appellant had been seeing other women outside the state. Counsel also strongly implied that Dawn was lying about threats being made during the telephone calls from jail because she and appellant spoke for such a long time during numerous calls. Dawn's videotaped statement from September 28, 2000, served to refute these implications.

With respect to Adam, defense counsel asked Adam if he had had a discussion with his mother about testifying and whether she gave him the idea of saying he would be scared to testify because appellant would be in court.

Moreover, given the negative nature of counsel's impeachment of Dawn and Adam regarding their interview with Deputy Castillo on the night of the offenses, the timing of the proffered prior consistent statement loses significance. In *People v. Gentry* (1969) 270 Cal.App.2d 462 [76 Cal.Rptr. 336], the court articulated an exception to the Evidence Code section 791 requirement that the prior consistent statement must have been made before an improper motive is alleged to have arisen. (*People v. Gentry, supra,* at p. 473.) "Different considerations come into play when a charge of recent fabrication is made *by negative evidence* that the witness did not speak of the

matter before when it would have been natural to speak," and the witness's silence is alleged to be inconsistent with trial testimony. (*Ibid.*) In this scenario, the evidence of the consistent statement becomes proper because " 'the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story.' " (*Ibid.*; see also *People v. Manson* (1976) 61 Cal.App.3d 102, 143 [132 Cal.Rptr. 265].)

In addition, the videotape was not more prejudicial than probative under Evidence Code section 352, which provides that the court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The time taken up by the videotape, approximately one hour, would have been the same, or perhaps longer, had the prosecution asked Deputy Shoemaker about each of the consistent statements. Moreover, the statements in the videotaped interviews were duplicative of the trial testimony by Dawn and Adam. There was no misleading of the jury or confusion of the issues. Appellant has not shown any undue prejudice. The jury rejected the charge in count 1 in favor of a lesser included offense. It is not reasonably probable appellant would have obtained a more favorable result if the videotaped interview had not been played for the jury.[5]

## DISPOSITION

The judgment is affirmed.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied November 1, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 15, 2003. Kennard, J., was of the opinion that the petition should be granted.

---

[5]Finally, because we have addressed appellant's claims on the merits, we need not address his contention that any issues deemed waived below were instances of ineffective assistance of counsel. Appellant makes no other claim of ineffective assistance, and there is no indication that defense counsel was other than a vigorous advocate on appellant's behalf.