FIELDS, J.
*953 I. INTRODUCTION
A jury found defendant and appellant, Jason Arron Arredondo, guilty of 14 sex offenses against four girls, namely, his three stepdaughters, F.R., A.J.R., A.M.R., and another girl, M.C., a friend of F.R.'s.[1]
*47 Defendant was sentenced to 33 years plus 275 years to life in state prison.
In the published portion of this opinion, we address defendant's claim that his Sixth Amendment right to "face-to-face" confrontation was violated when the trial court allowed a computer monitor on the witness stand to be raised by several inches to allow F.R. (age 18), A.J.R. (age 14), and A.M.R. (age 13), to testify without having to see defendant. We find no confrontation clause violation. The parties agree the matter must be remanded for resentencing on counts 1, 12, and 14. We remand the matter for resentencing and affirm the judgment in all other respects.
*954 II. FACTUAL BACKGROUND
A. Prosecution Evidence
1. General Background
Defendant was born in 1974. For several years, until September 2013, defendant lived with his girlfriend, A.G., her two sons, and her three daughters, F.R., A.J.R., and A.M.R. The three girls, along with F.R.'s best friend M.C., testified at trial, in June 2015, that defendant repeatedly molested them when they were under the ages of 14, and in F.R.'s case, when she was also under the age of 16. Two adult female witnesses also testified that defendant molested them, years earlier, when they were under the ages of 14 and 16. ( Evid. Code, § 1108.)
Around 2011, when F.R. was age 14, she, her siblings, her mother, and defendant (the family) moved into a four-bedroom house on Olive Street in Perris, where F.R., A.J.R., and A.M.R. shared a bedroom. Defendant's mother, Mrs. A., and one of his brothers also lived in the Olive Street house. Before moving into the Olive Street house, the family lived on Eugene Street in Perris. Before that, the family lived with defendant's mother in Corona and stayed with A.G.'s mother in Canyon Lake.
2. Sexual Assaults on M.C.
M.C., born in 1999, was a 16-year-old high school junior at the time of trial in June 2015. At that time, M.C. and F.R. had been best friends for eight years. M.C. first met defendant when she was around 13 years old and in the 7th grade. M.C. often visited the family at the Olive Street house.
Once, when M.C. was 13 years old, she spent the night at the Olive Street house and slept on A.M.R.'s lower bunk bed. Around 5:00 a.m., M.C. woke and found defendant sitting next to her, rubbing her leg with his arm. Defendant left the room when he saw M.C. was awake. M.C. called her parents to pick her up because she was scared. Another time, M.C. and F.R. were in the garage at the Olive Street house trying on "dirt" biking gear. Defendant was helping M.C. adjust her shirt when he put his hands inside her shirt and grabbed her breasts. M.C. gave defendant a "weird" look, and defendant apologized.
On another occasion, after the incident in the garage, defendant was "throwing" M.C. and other children around in the swimming pool at the Olive Street house when he touched M.C. in her vaginal area, on her "butt," and "on [her] breast area." After the pool incident, in July 2013, M.C. was *955 lying on a bed, coughing, in the girls' bedroom at the Olive Street house. Defendant came into the room, put his hand in M.C.'s shirt and "squeezed" her breast, saying he was checking something. Later that day, M.C. asked F.R. whether defendant had done anything like that to her. F.R. kept her head down and seemed "really eager" to change the subject.
Around one week after the coughing incident, on July 26, 2013, M.C. and F.R.
*48 were lying on their stomachs on a bed, talking on their phones, when defendant began massaging their backs over their shirts. Defendant gradually moved his hands lower and began touching their butts. F.R. "yelled" at defendant to stop and leave the room, and defendant left. M.C. specifically recalled that the "butt massage" incident occurred on July 26, 2013, because later that evening she was struck by a car.
As fresh complaint evidence,[2] M.C. testified that during the evening of July 26, 2013, F.R. told M.C. that something had happened between F.R. and defendant. After that disclosure, M.C. told F.R. that M.C. needed to ask F.R.'s younger sisters whether defendant had ever hurt them. M.C. and F.R. then spoke with A.J.R., who immediately began to cry and disclosed what had happened to her. M.C. next spoke with A.M.R., who said something had happened to her too. Around September 2013, M.C. disclosed the molestations to a school counselor, then spoke with the police. Shortly thereafter, defendant was arrested.
3. Sexual Assaults on F.R.
F.R., born in 1997, was an 18-year-old high school junior at the time of trial. She recalled that she was seven years old when defendant became her mother's boyfriend, and eight years old when defendant began touching her inappropriately. The molestations continued in all four of the homes in which the family lived. The first touching occurred one morning when F.R. was eight years old (around 2005), after F.R., other family members, and defendant had been sleeping on the floor at defendant's mother's house in Corona. While F.R. pretended to be asleep, defendant held F.R.'s hand on his penis and moved her hand. On a later occasion at the Corona house, when F.R. was still age eight, defendant either vaginally or anally penetrated F.R. while she pretended to be asleep on the living room sofa. Defendant also penetrated F.R. either vaginally or anally on another occasion at A.G.'s mother's *956 house in Canyon Lake. Another time, when F.R. was in the 3rd to the 5th grade, defendant touched her with his penis. Defendant frequently touched F.R.'s breasts, over and under her clothes, and would apologize, saying it was an accident. F.R. denied ever seeing defendant's penis, because her eyes were always closed.
4. Sexual Assaults on A.J.R.
A.J.R., who was born in 2000, was age 14, and in 10th grade at the time of trial, testified defendant first molested her when she was age eight (around 2008). The molestations continued, once or twice weekly, for the "whole time" the family lived in the Olive Street house when A.J.R. was 11 to 12 years old. Defendant would tell A.J.R. he needed her to help him in the garage, and she was too scared to say no. He would take her pants and underwear off or tell her to do so. He would touch her with his hands on her breasts and her vaginal area, and he would have her touch his penis. He orally copulated her twice, and had her engage in both vaginal and anal intercourse with him.
*49 Defendant penetrated A.J.R. with his fingers and penis in the garage, in his room, in her room, and in her brothers' room. Sometimes when A.J.R. was showering, defendant would remove his clothes and get into the shower with her, where he would wash her, grab her hand, and tell her to hold onto and wash his erect penis. It hurt when defendant was sexually assaulting A.J.R., but she complied and did not disclose the abuse because she was scared. Defendant had anal sex with A.J.R. nearly every time he said he needed her in the garage. She would lie on the sofa in the garage, usually with her clothes off, and he would lay on top of her. Once, while having anal sex with her, defendant told A.J.R. to hold on a little longer. Defendant did the same things to A.J.R. before they lived in the Olive Street house.
Defendant told A.J.R. not to tell her mother, A.G., about the molestations. At one point, A.J.R. wrote a note to A.G. about the molestations and put the note in her mother's purse. A.G.'s purse was messy, however, and A.J.R. did not believe A.G. saw the note. Around one week after A.J.R. wrote the note, A.G. and defendant picked up A.J.R. from school, and defendant promised A.J.R. "it would never happen again" without saying what he was talking about. A.J.R. was in 6th or 7th grade at the time, and A.G. was crying. A.G. "just looked [A.J.R.] in the eye and just held [her] hand."
During the 2012-2013 school year, when A.J.R. was in 7th grade, she wrote in one of her textbooks: "I took a dick up my ass. Feels good," "Tek Wood [A.J.R.'s brother's friend] needs to put his dick in my ass. He's hot," "But your dick does. It grows. I saw my dad's, I know. I saw a pic when he *957 was small and rite (sic) now." She also wrote "me and my stepdad," and "[h]is dick," with an arrow pointing to a picture, and another arrow pointing to a picture that said "[m]y vagina." She wrote, "I'm not a virgin. My stepdad had sex with me. I'm saying the truth." A.J.R. testified the writings were a joke but that she also wanted people to know about the molestations. Her teacher saw the writings and discussed them with A.J.R. around the time the police were investigating the case. Defendant told A.J.R. that the molestations were their secret, and if she told anyone about them he would go to jail.
5. Sexual Assaults on A.M.R.
A.M.R. was age 13 and in 8th grade at the time of trial. She testified that defendant molested her in the Olive Street house and its garage when she was 11 years old. Defendant would come into her bedroom while she was sleeping and touch her vaginal area under her clothes. Around 10 times, he digitally penetrated her vagina with his fingers. She began wearing one-piece pajamas and thicker clothing to make it more difficult for defendant to molest her, but when she did so, around five times, he touched her vaginal area outside her clothes. She would move away from defendant when he was touching her, but he would move her back. About five times in the swimming pool at the Olive Street house, defendant moved her bathing suit to the side and digitally penetrated her vagina.
6. Evidence of Defendant's Prior Sexual Assaults ( Evid. Code, § 1108 )
(a) C.B.
C.B., born in 1983 and age 32 at trial, testified that defendant's younger brother, J., was her boyfriend when she was age 13 and in middle school, around 1996. Defendant and J.'s stepsister was her best friend. C.B. lived in the same apartment complex where J. and defendant lived with their father. Defendant was nine years older and much taller and heavier than *50 C.B. One day, when she was age 13, C.B. was with J. and his stepsister at defendant's father's apartment. C.B.'s hair became knotted, and she went into the father's master bedroom shower to wash and condition her hair. She locked the bedroom and bathroom doors behind her because defendant had been "very touchy-feely" with her. When she got out of the shower, she heard a knock on the bathroom door and, thinking it was J., opened the door. Defendant was there, asked her what she was doing, and she explained what she was doing. Defendant grabbed her towel from her, leaving her naked. She ran up to defendant to cover herself, and asked for her towel back, but defendant pushed his way into the bathroom, closing the door behind him.
Defendant grabbed C.B., pushed himself against her, and pushed her into the sink counter, while rubbing his lower body against her. He rubbed her *958 breasts and vaginal area with his fingers. Then he picked her up and put her on the sink counter, took his penis out of his pants, and tried to insert it inside her. He had one arm behind her back to hold her close to him, and put his penis inside of her with his other hand. She was telling him to stop, but he did not. She began to yell for J., but defendant covered her mouth with his other hand. She hit the bathroom window, trying to break it, but was unable to.
Defendant forced his penis inside her for a couple of minutes, ejaculated on the counter, told her to get dressed, and left. C.B. had blood on her back from being scraped on the sink faucet. She quickly rinsed off the blood in the shower, got dressed, and ran out of the apartment. She told J. about the incident, but she did not tell anyone else or report the incident to the police because she was scared.
In a later incident, C.B. was having a sleepover with J.'s stepsister in defendant's father's apartment. C.B. and the stepsister were sleeping in the living room when defendant and his girlfriend came into the apartment. C.B. later woke to find defendant rubbing her vaginal area with his fingers. She told defendant to stop, and defendant told her to be quiet. C.B. kept getting louder in telling defendant to stop. Defendant finally stopped and went into the bedroom.
On another occasion, C.B. went with defendant in his truck to pick up his girlfriend from work. The three of them were going to a family barbecue. Before he picked up his girlfriend, defendant pulled his truck behind some of the stores in the center where his girlfriend worked, and parked the car where no one would see him and C.B. He got out of the car, opened the passenger door, and tried to get C.B. out of the truck by pulling her legs out of the door. C.B. was fighting back and did not want to get out of the truck. Defendant pulled C.B.'s pants down to her knees, as C.B. was telling him to stop and trying to pull her pants back up. Defendant's erect penis was out of his pants, and he tried to get on top of her and have sex with her. After C.B. began to cry, defendant stopped and told her to get dressed.
Defendant inappropriately touched C.B. too many times for her to recall. Many times he would grab her breasts, vaginal area, and buttocks. Another time, when C.B. was staying the night at defendant's mother's house, defendant tried to get in bed with C.B. and touched her vaginal area. C.B. kept going to defendant's family's home because she loved J. When C.B. was around age 15, her mother learned what defendant had done and reported the matter to the police. C.B. did not tell the police everything defendant had done, because she was "young and scared" and it was "overwhelming" to her. Several years before trial in June 2015, C.B. ran into *51 defendant in Lake *959 Havasu, Arizona, while she was on vacation. Defendant apologized to C.B. and said he was willing to accept responsibility for what he had done to her.
(b) R.G.
Defendant's cousin, R.G., born in 1980 and age 34 at trial, testified that defendant, his older brother, and his father lived with R.G.'s family in San Diego for around one month when R.G. was in elementary school. Defendant repeatedly molested R.G. during the month he lived in her home. He would grab her buttocks over her clothes, have her sit on his lap while he was erect, lift her skirt and touch her bottom, put his mouth on her face, and tell her it would help him grow. He also told her not to tell anyone what he was doing. R.G. told her mother that defendant grabbed her butt, but she did not report the other details of abuse to anyone because she was scared and did not want to disrupt her mother's relationship with her uncle, defendant's father.
7. Additional Prosecution Evidence
Investigators discovered that defendant's cell phone contained a photograph, dated June 17, 2013, of a semi-clothed female with a male's hand on her buttocks. The photograph had the word "www.teenku.com" written on the top, indicating it came from that Web site.
B. Defense Evidence
The defense called A.J.R. and F.R. to testify and asked each of them whether there was anything abnormal about defendant's penis. A.J.R. said it looked "[n]ormal, I guess" and F.R. testified she never saw it and could not describe it. The defense then adduced photographs of defendant's penis, taken by the defense investigator in 2015, showing a discoloration of the skin.
Defendant called C.H., defendant's friend of 35 years, who testified defendant was "[l]ike a brother" to him, and he often visited the family at the Olive Street house. C.H. claimed that F.R., A.J.R., and A.M.R. never appeared uncomfortable around defendant. Defendant would discipline the girls and none of them, especially F.R., liked being disciplined by defendant. Defendant was a welder, often traveled for work, and would be gone for weeks at a time. At the Olive Street house, the garage door was "always open," it could only be closed from the outside, and it was very difficult to close. C.H. did not recall a sofa being in the garage.
Defendant's mother, Mrs. A., testified she lived with defendant, A.G., and A.G.'s five children from the summer of 2009 until defendant was taken *960 into custody around September 2013. Defendant worked long days; he would leave for work at 4:00 a.m. and return home at 5:00 or 6:00 p.m. He also traveled for work and was away from home for long periods of time. He was a father figure to all of A.G.'s children, and the three girls, especially F.R., appeared to resent him for disciplining them. A.J.R. became angry, swore, and slammed doors when defendant disciplined her for lying. At times, M.C. was not welcome in the home because she set a bad example for the other children. F.R. would yell at A.G., wanted to go to parties, and once ran away from home for one month. When defendant was absent from the home, the children had "full rein" and "no discipline."
The defense elicited testimony from C.H. and Mrs. A. that defendant was a person of good character who was unlikely to molest children. We discuss this testimony below in connection with defendant's claim that the trial court erroneously allowed the prosecutor to impeach C.H. and Mrs. A. by asking them whether their *52 opinions of defendant would change if they knew defendant had a prior conviction for committing a lewd act on a child under age 14. ( § 288, subd. (a).)
C. Prosecution Rebuttal Evidence
In order to show defendant's penis was not discolored, the prosecution played a video, taken from defendant's cell phone, showing his penis.
III. DISCUSSION
A. Defendant's Confrontation Claim Fails Regarding F.R., Was Forfeited Regarding A.J.R. and A.M.R., and No Ineffective Assistance of Counsel Is Shown
Defendant claims his "face-to-face" confrontation rights were violated when the trial court allowed a computer monitor on the witness stand, which was normally used for witnesses to view exhibits while testifying, to be elevated by several inches to allow F.R., A.J.R., and A.M.R. not to have to see defendant as they testified. Defendant argues that the raising of the monitor violated his Sixth Amendment right to face-to-face confrontation because it blocked his "entire view" of the girls, and the girls' view of him, as the girls testified.
As we explain, there was no confrontation violation regarding F.R. The record supports the court's finding that raising the computer monitor in order to block F.R.'s view of defendant while F.R. testified-which also blocked defendant's view of F.R.-was necessary in order to protect F.R. from severe emotional trauma from having to testify with defendant looking at her.
*961 Defendant has forfeited his Sixth Amendment claim regarding A.J.R. and A.M.R., and on this record, defendant has not demonstrated that his counsel rendered ineffective assistance of counsel in failing to object when the monitor was raised while A.J.R. and A.M.R. testified.
1. Relevant Background
Of the six witnesses who testified that defendant molested them when they were minors, M.C. testified first, followed by F.R., A.J.R., A.M.R., C.B., and R.G. The defense briefly called A.J.R., then F.R., to testify. F.R. stepped up to the witness stand to be sworn and testify for the prosecution at 10:30 a.m. The court asked F.R. whether she needed a moment, and she said, "I think so." The court said it would take a brief recess.
Outside the presence of the jury, the court told the prosecutor to have the victim-witness advocate for F.R. spend some time with F.R., and after that to "let [the court] know if she is able to proceed or ready to proceed and we will resume." The prosecutor said she would ask F.R. whether she preferred the advocate to sit behind F.R. while F.R. testified. The court said, "Oh, yes. Right. If there's something like that that you can do that would make her more comfortable, I'm fine with that."
The court's minute order shows the recess lasted one-half hour, until 11:00 a.m., and was taken "to allow for witness composure." F.R. began testifying at 11:05 a.m. Before F.R. began testifying, the court noted it had made "some modifications to the witness box to accommodate" F.R. F.R.'s victim-witness advocate also sat near F.R. while she testified. During the next recess at 11:53 a.m., the court said: "I just want to note for the record that I had mentioned earlier that the witness box had been reconfigured a little bit. It's not a big change, but the monitor was placed kind of to the witness's right, apparently blocking at least some of her view of [defendant]." The court then asked defense counsel whether he had anything he wanted to say about that.
*53 Defense counsel responded: "Yes I did. Your Honor. It does block [defendant's] entire view of the witness." The court replied: "Well, he is present in court. He can hear the witness, hear her answers. I think it's appropriate given her initial reaction. Again, for the record when she first came in to take the oath, she was unable to proceed at that time. We took about a 15-minute break before she could get her emotions back in order."[3] Defense counsel *962 next pointed out that defendant was unable to see F.R. as she testified and was accordingly unable to assist defense counsel in knowing whether F.R. was not telling the truth or "feigning something." Defense counsel had never seen F.R. before, but defendant had been her "quasi parent" and knew how she looked when she was not telling the truth.
The court overruled the confrontation objection, explaining: "It's a fairly small computer monitor that's on the witness stand. It's there for the witness to be able to view photographs that are shown on the monitor. Again, it was simply repositioned so that the witness doesn't have to look at [defendant]. I think-at best it's a small infringement on his confrontation rights. I think it's an allowable infringement on his right to confrontation ... it's a very limited blockage, if you will."
At that point, the prosecutor clarified that the monitor was in the same place it was in when M.C. testified but it was "elevated" by placing two books beneath it-a Penal Code volume and a CALCRIM volume. The prosecutor argued this was appropriate, "[g]iven that [F.R.] had indicated that the defendant looked at her the first time she came [into the courtroom]." The court thanked the prosecutor for noting that the books had been placed beneath the monitor as the court "didn't see that."
Defense counsel then pointed out that F.R. began crying "before she was even able to see [defendant's] face," and that defendant "made no effort to look at her, intimidate her, or make any kind of eye contact or suggestive contact with her." The court responded: "I understand. I'm not casting any aspersions at this point. But it clearly affected her, and I think it's appropriate for the court to take whatever small efforts it can ... to make F.R. more comfortable without infringing on any of [defendant's] constitutional rights. ..."
After both sides rested but before closing arguments, the prosecutor noted for the record that "the monitor on the witness stand was elevated for various witnesses. Starting with [F.R.], it was elevated. It remained elevated through [F.R., A.J.R., and A.M.R.] It was then removed for [C.B.] through the rest of the People's case. It was put back for the children [A.J.R. and F.R.] yesterday morning [when they were called by the defense]. It then did not move until after the end of yesterday, which was with [Mrs. A.], and it has not been there today." The record thus shows that raising the computer monitor by several inches was the only modification the court made to the witness box and to the entire courtroom while F.R., A.J.R., and A.M.R. testified.
2. Applicable Legal Principles
The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy *54 the right ... to be confronted with *963 the witnesses against him ...." The confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." ( Coy v. Iowa (1988) 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 ( Coy ).) The right to face-to-face confrontation is not absolute, however, and alternative procedures may be used when (1) necessary to further an important or compelling state interest, and (2) the reliability of the testimony is otherwise assured. ( Maryland v. Craig (1990) 497 U.S. 836, 844, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 ( Craig ).)
The defendant in Coy was convicted of sexually assaulting two 13-year-old girls. ( Coy , supra , 487 U.S. at p. 1014, 108 S.Ct. 2798.) The girls were allowed to testify against the defendant through a large screen, which allowed the defendant "dimly to perceive" the girls but which blocked the girls' entire view of the defendant. ( Id . at pp. 1015, 1020, 108 S.Ct. 2798.) The defendant objected to the use of the screen on confrontation grounds. ( Id . at p. 1015, 108 S.Ct. 2798.) The high court reversed the judgment, finding that the use of the screen violated the defendant's right to face-to-face confrontation. ( Id . at pp. 1020-1021, 108 S.Ct. 2798.)
Coy emphasized that the Sixth Amendment's guarantee of face-to-face encounters between the criminally accused and their accusers has "a lineage that traces back to the beginnings of Western legal culture." ( Coy , supra , 487 U.S. at pp. 1015-1016, 108 S.Ct. 2798.) Like the right to cross-examine one's accusers, which is "a less explicit component of the Confrontation Clause," the right to face-to-face confrontation ensures the integrity of the factfinding process. ( Id . at pp. 1019-1020, 108 S.Ct. 2798.) Coy elaborated: "The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential 'trauma' that allegedly justified the extraordinary procedure [the use of the screen] in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." ( Id . at p. 1020, 108 S.Ct. 2798.)
Coy also emphasized that face-to-face confrontation plays an essential role in ensuring the defendant receives a fair trial, which the high court in Craig later referred to as "the strong symbolic purpose" served by requiring adverse witnesses at trial to testify in the presence of the accused: "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' [Citation.] ... The phrase still persists, 'Look me in the eye and say that.' " ( Coy , supra , 487 U.S. at pp. 1017-1018, 108 S.Ct. 2798 ; Craig , supra , 497 U.S. at p. 847, 110 S.Ct. 3157.) "The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. ... It is always more difficult to *964 tell a lie about a person 'to his face' than 'behind his back.' ... The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions." ( Coy , supra , at p. 1019, 108 S.Ct. 2798.)
Coy declined to determine whether there were any exceptions to the right to face-to-face confrontation, given that the trial court made no "individualized findings" that the child witnesses needed any "special protection." ( *55 Coy , supra , 487 U.S. at p. 1021, 108 S.Ct. 2798.) An Iowa statute authorized the use of the screen to block the defendant's and the witnesses' views of each other, but the high court emphasized that the "generalized finding[s]" or "legislatively imposed presumption of trauma" to the witnesses, underlying the Iowa statute, were insufficient to justify depriving the defendant of his Sixth Amendment right to face the witnesses at trial. ( Ibid . ) Coy stated: "Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." ( Ibid . )
In 1990, two years after Coy was decided in 1988, Craig clarified that the right to face-to-face confrontation is not absolute, and alternative procedures may be used when it is shown that (1) such procedures are "necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." ( Craig , supra , 497 U.S. at pp. 849-850, 110 S.Ct. 3157.) Craig involved a six-year-old alleged child abuse victim who testified against the defendant by one-way closed-circuit television. The defendant, the trial judge, and the jury were in the courtroom while the child was in another room being examined by the prosecutor and defense counsel. A video monitor recorded and displayed the child's testimony to those in the courtroom. The child could not see the defendant as she testified, but the defendant could see the child, and the defendant was in electronic communication with her defense counsel while the child testified. ( Id . at pp. 840-842, 110 S.Ct. 3157.)
Regarding the reliability of the child's testimony, Craig emphasized that the Maryland statute preserved all of the "other" elements of the right to confrontation: "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. ... [T]he presence of these other elements of confrontation-oath, cross-examination, and observation of the witness' demeanor-adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing ...." ( Craig , supra , 497 U.S. at p. 851, 110 S.Ct. 3157.) Craig thus concluded that use of the one-way closed-circuit television procedure did not "impinge on the truth-seeking or symbolic purposes of the Confrontation Clause." ( Id . at p. 852, 110 S.Ct. 3157.)
*965 Regarding the state's interest in protecting child witnesses, Craig reasoned that a state's interest in " 'the protection of minor victims of sex crimes from further trauma and embarrassment,' " or in " 'safeguarding the physical and psychological well-being of a minor' " is not just an important state interest, but a " 'compelling' " one, and such interest, "may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." ( Craig , supra , 497 U.S. at pp. 852-853, 110 S.Ct. 3157.) Craig thus held that "if the State makes an adequate showing of necessity , the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." ( Id . at p. 855, 110 S.Ct. 3157, italics added.)
Craig explained that "the requisite finding of necessity" must be "case-specific" and the trial court must make several findings of case-specific necessity before allowing a witness to testify by means of a procedure other than face-to-face confrontation with the defendant: "The requisite *56 finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. [Citations.] The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant . [Citations.] Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. ... Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis , i.e. , more than 'mere nervousness or excitement or some reluctance to testify,' [citations]." ( Craig , supra , 497 U.S. at pp. 855-856, 110 S.Ct. 3157, all except latter italics added.)
Craig concluded that the Maryland statute met these constitutional standards by requiring the trial court to determine that the child witness would suffer " 'serious emotional distress such that the child cannot reasonably communicate.' " ( Craig , supra , 497 U.S. at p. 856, 110 S.Ct. 3157.) Craig declined to decide the minimum showing of emotional trauma required to meet these constitutional standards. ( Ibid. )
In a subsequent California case, People v. Sharp (1994) 29 Cal.App.4th 1772, 36 Cal.Rptr.2d 117 ( Sharp ), disapproved on other grounds in People v. Martinez (1995) 11 Cal.4th 434, 452, 45 Cal.Rptr.2d 905, 903 P.2d 1037, the prosecutor was allowed to sit in a chair to the right of the witness stand so that a child witness could focus on the prosecutor and not have to look at the *966 defendant while the child testified. The child could see the defendant if she turned her head, and the defendant's view of the child was "limited only in his view of a portion of her face." ( Sharp , supra , at pp. 1781-1784, 36 Cal.Rptr.2d 117.) The defendant was on trial for sexually abusing the child when she was eight years old. ( Id . at pp. 1776, 1778, 36 Cal.Rptr.2d 117.)
Sharp held the alternative seating arrangement for the child satisfied the two-part test of Craig : The reliability of the child's testimony was assured, because the child testified in court, under oath, and was subject to contemporaneous cross-examination. And, though the trial court made no express findings that the alternative seating arrangement was necessary to protect the child from emotional trauma, the record amply supported such a finding. The child was having "difficulty focusing" and was under "considerable distress" while she testified for two hours before the prosecutor's chair was moved and the child could testify facing away from the defendant. ( Sharp , supra , 29 Cal.App.4th at pp. 1783-1786 & fn. 5, 36 Cal.Rptr.2d 117.) While seated facing the defendant, the child was "unable to participate effectively in the proceedings." ( Id . at p. 1783, 36 Cal.Rptr.2d 117.)
Based on its "careful review" of the record, Sharp reasoned that blocking the defendant's view of "only a portion" of the child's face was a "minor interference" to the defendant's confrontation rights, "fully justified" by the circumstances of the case. ( Sharp , supra , 29 Cal.App.4th at p. 1784, 36 Cal.Rptr.2d 117.) Sharp pointed out that defendant's "interest in having a literal face to-face meeting" with the child had to be balanced against two "important interests" of the state: (1) protecting the child from "unnecessary emotional trauma" and (2) obtaining the child's "complete and accurate" testimony. ( Id . at p. 1783, 36 Cal.Rptr.2d 117, citing Craig , supra , 497 U.S. at pp. 845-846, 110 S.Ct. 3157.)
In the more recent California Supreme Court case of *57 People v. Gonzales (2012) 54 Cal.4th 1234, 144 Cal.Rptr.3d 757, 281 P.3d 834 ( Gonzales ), the state high court followed Sharp and found no confrontation violation in circumstances substantially similar to those in Sharp . ( Gonzales , supra , at pp. 1267-1268, 144 Cal.Rptr.3d 757, 281 P.3d 834.) The defendant in Gonzales was tried and convicted of the torture-murder of his four-year-old niece, Genny. ( Id . at p. 1242, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Genny lived with the defendant, his wife, and their six children, including their oldest son, Ivan, Jr. ( Id . at pp. 1242-1243, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Ivan, Jr. was eight years old when he testified at his father's preliminary hearing. Ivan, Jr. testified to events he witnessed on the night of Genny's murder, that he had previously seen his mother and the defendant severely abuse Genny, and that he feared his father. ( Id . at pp. 1247-1248, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Ivan, Jr.'s preliminary hearing testimony was admitted at the defendant's trial in lieu of his live testimony. ( Id . at pp. 1247, 1261, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Evid. Code, § 1291.) *967 At the preliminary hearing, the court granted the prosecutor's motion to allow Ivan, Jr. and other "juvenile witnesses" to be seated "facing away " from the defendant. ( Gonzales , supra , 54 Cal.4th at p. 1265, 144 Cal.Rptr.3d 757, 281 P.3d 834, italics added.) The podium for counsel was placed so that the lawyers had eye contact with the witnesses, and the witnesses were "free to look around the courtroom and make eye contact" with the defendant, "if they desired." ( Ibid . ) On appeal, the defendant claimed the admission of Ivan, Jr.'s preliminary hearing testimony at trial violated his confrontation rights because the preliminary hearing court did not make "a case-specific factual finding of necessity for an alternative arrangement for Ivan, Jr.'s testimony, as required under Craig ." ( Id . at p. 1266, 144 Cal.Rptr.3d 757, 281 P.3d 834.) The defendant argued the prosecution "made no factual showing" at the preliminary hearing "to support its claim" that Ivan, Jr. feared his parents. ( Ibid . ) The defendant did not challenge the trial court's finding that Ivan, Jr. was unavailable to testify due to the trauma he would suffer if made to testify. ( Id. at p. 1261, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Evid. Code, §§ 240, 1291.)
In rejecting the defendant's confrontation claim, Gonzales first noted that the defendant had no right to "personally" confront Ivan, Jr. at the preliminary hearing, because confrontation is a trial right that does not apply "with full force" at a preliminary hearing, and Ivan, Jr.'s testimony could have been presented through hearsay testimony by police officers without offending the state or federal Constitution. ( Gonzales , supra , 54 Cal.4th at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834, citing People v. Miranda (2000) 23 Cal.4th 340, 348-349, 96 Cal.Rptr.2d 758, 1 P.3d 73.) Gonzales reasoned: "Thus, there was no occasion for the preliminary hearing court to make Craig findings, and defense counsel did not request them." ( Gonzales , supra , at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Regarding the defendant's claim that the alternative seating arrangement violated his confrontation rights, Gonzales pointed out: "This is a particularly artificial argument, insisting on Craig findings even though no context for such findings ever arose. In any event, the claim fails on its merits." ( Ibid . )
Gonzales proceeded to follow Sharp and conclude there was no confrontation violation, after noting that Sharp "involved the same seating arrangement at trial as was employed at defendant's preliminary examination." ( Gonzales , supra , 54 Cal.4th at pp. 1267-1268, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Gonzales noted with approval Sharp 's observations that the alternative *58 seating arrangement " 'resulted in only the most minimal interference with appellant's right to confront his accuser' " and was "justified by the state's interest in protecting the child witness and obtaining accurate testimony." ( Gonzales , supra , at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834, citing Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117.)
Gonzales also pointed out that: "While the trial court [in Sharp ] had not made the findings required by Craig , the Sharp court had no difficulty ascertaining from the record that the seating arrangement was fully justified.
*968 [Citations.]" ( Gonzales , supra , 54 Cal.4th at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834.) Gonzales noted that "[o]ther state courts have approved the use of similar seating arrangements, without the findings required by Craig. " ( Id. at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834, fn. 17 & cases cited.) And "while the preliminary hearing court made no factual findings on the need to shield Ivan, Jr. from defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial." ( Id . at p. 1268, 144 Cal.Rptr.3d 757, 281 P.3d 834.) The defendant did not "dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial." ( Ibid . ) Thus, Gonzales concluded: "Here, as in Sharp ... the seating arrangement for the child witness's testimony was fully justified by the record, and defendant's confrontation rights were not violated when the videotape was introduced at trial. The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' ( Craig , supra , 497 U.S. at p. 846, 110 S.Ct. 3157.)" ( Ibid . )
3. Defendant's Sixth Amendment Claim Regarding F.R. Lacks Merit
(a) The Two-Part Test of Craig Was Satisfied
Defendant's confrontation claim involves mixed questions of law and fact. "We review de novo a claim under the confrontation clause that involves mixed questions of law and fact. [Citation.] Under this standard, we defer to the trial court's determination of 'the historical facts'-which 'will rarely be in dispute'-but not the court's 'application of [the] objective, constitutionally based legal test to [those] historical facts.' [Citation.]'' ( People v. Giron-Chamul (2016) 245 Cal.App.4th 932, 964, 200 Cal.Rptr.3d 159, citing People v. Cromer (2001) 24 Cal.4th 889, 896-897, 899-901, 103 Cal.Rptr.2d 23, 15 P.3d 243 ; People v. Lujan (2012) 211 Cal.App.4th 1499, 1505, 150 Cal.Rptr.3d 727 ( Lujan ).) We apply the substantial evidence standard to the trial court's factual findings-whether those findings are express or may be inferred from the record. (See Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888, 264 Cal.Rptr. 139, 782 P.2d 278 [discussing standards of review applicable to predominantly legal and factual questions]; People v. Powell (2011) 194 Cal.App.4th 1268, 1284, fn. 6, 124 Cal.Rptr.3d 214.)
As in Gonzales and Sharp , the record shows that the use of the computer monitor to block F.R.'s view of defendant, which also blocked defendant's "entire view" of F.R., satisfied the two-part test of Craig . First, the reliability of F.R.'s testimony was assured: F.R. testified under oath, subject to cross-examination, and the jury had an unobstructed view of F.R. while she testified. ( Craig , supra , 497 U.S. at pp. 850, 857, 110 S.Ct. 3157 ; Gonzales , supra , 54 Cal.4th at p. 1268, 144 Cal.Rptr.3d 757, 281 P.3d 834 ;
*59 Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117.)
*969 Second, the record supports the trial court's implied findings that the use of the computer monitor was necessary to further two important state interests: (1) protecting F.R. from suffering serious emotional trauma while testifying; and (2) obtaining F.R.'s "complete and accurate" testimony. ( Craig , supra , 497 U.S. at pp. 850-852, 110 S.Ct. 3157 ; Gonzales , supra , 54 Cal.4th at pp. 1267-1268, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117.) The record shows F.R. was not merely crying or "uncomfortable" when she first stepped to the witness stand, but was so emotionally upset that she was unable to proceed and "participate effectively in the proceedings." ( Sharp , supra , at p. 1783, 36 Cal.Rptr.2d 117.) The record also shows that raising the computer to block F.R.'s view of defendant was necessary to allow F.R. to proceed and testify against defendant.
Though the trial court was not expressly asked to make a "case-specific finding" that repositioning the computer monitor to block F.R.'s view of defendant was necessary to further an important state interest ( Craig , supra , 497 U.S. at pp. 855-856, 110 S.Ct. 3157 ), the court effectively made this finding and substantial evidence supports it. In overruling defendant's confrontation objection, the court found that raising the monitor was "appropriate" given that F.R. was emotionally upset and "unable to proceed" when she first stepped to the witness stand. The court also indicated that the prospect of testifying while facing defendant "clearly affected" F.R. and was the cause of her emotional trauma and inability to proceed. In the court's words, the computer monitor was "simply repositioned so that the witness doesn't have to look at Mr. Arredondo."
The record also supports the court's finding that F.R. was emotionally upset and unable to proceed because she had to testify facing defendant, and not merely because she had to testify or for any reason unrelated to defendant. ( Craig , supra , 497 U.S. at p. 856, 110 S.Ct. 3157.) Indeed, the entire on-the-record discussion between the court and counsel concerning the need to raise the computer monitor was based on F.R. being too upset to testify because she had to face defendant. Defense counsel raised no concern that F.R. was upset because she had to testify or for any reason unrelated to facing defendant. If F.R. had been upset for reasons unrelated to facing defendant, there would have been no point in repositioning the monitor to block F.R.'s view of defendant.
Here, as in Gonzales , defense counsel did not dispute that F.R. was too emotionally upset to proceed without the use of the computer monitor. ( Gonzales , supra , 54 Cal.4th at p. 1268, 144 Cal.Rptr.3d 757, 281 P.3d 834 ["Defendant does not dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial."].) Instead, defense counsel protested that the monitor blocked defendant's entire view of F.R., preventing defendant from *970 assisting defense counsel in knowing whether F.R. was telling the truth. In this regard, defense counsel noted defendant had done nothing to intimidate F.R. and that F.R. was crying even before she was able to see defendant. In response, the trial court said it was not "casting any aspersions" on defendant, but the prospect of having to testify while facing defendant had "clearly affected" F.R.
Now, however, defendant claims the trial court erroneously based its finding of a case-specific necessity for raising the computer monitor on the need to make *60 F.R. "more comfortable," rather than on the need to protect F.R. from serious or more than minimal emotional trauma, as Craig requires. ( Craig , supra , 497 U.S. at p. 852, 110 S.Ct. 3157.) Defendant argues the court used the "wrong standard" in finding that raising the computer monitor was necessary to protect F.R. from serious emotional trauma. We disagree.
Defendant's argument misconstrues the trial court's explanation for overruling his confrontation objection. Near the end of its discussion with counsel concerning the need to raise the computer monitor for F.R., the court said it was "appropriate for the Court to take whatever small efforts the Court can make to make [F.R.] more comfortable without infringing on any of [defendant's] constitutional rights ...." (Italics added.) The court made this "more comfortable" comment in response to defense counsel's representation that defendant made no attempt to look at or intimidate F.R. when she "first came in." In context, the court's "more comfortable" comment was a reference to its earlier finding that it was necessary to raise the monitor to protect F.R. from the emotional trauma of facing defendant while testifying. The record shows that making F.R. "more comfortable" was not the basis of the court's finding of a case-specific necessity to raise the computer monitor for F.R. Rather, the need to protect F.R. from serious emotional trauma and to render her able to testify were the reasons for raising the monitor. ( Gonzales , supra , 54 Cal.4th at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Sharp , supra , 29 Cal.App.4th at pp. 1783-1784, 36 Cal.Rptr.2d 117.)
(b) No Evidentiary Hearing Was Required
Relying on People v. Murphy (2003) 107 Cal.App.4th 1150, 132 Cal.Rptr.2d 688 ( Murphy ), defendant claims the trial court erroneously failed to hold an evidentiary hearing to determine whether raising the computer monitor was necessary to protect F.R. from serious emotional trauma. We find Murphy distinguishable on this point.
Murphy involved a witness who was age 31 when she testified at trial through a "slightly darkened" "one-way glass." ( Murphy , supra , 107 Cal.App.4th at pp. 1151-1153, 132 Cal.Rptr.2d 688.) The glass prevented the witness from seeing the defendant but allowed the defendant and the jury to observe the witness's *971 demeanor. ( Id . at p. 1152, 132 Cal.Rptr.2d 688.) The defendant was on trial for committing a forcible sex crime against the witness and for falsely imprisoning her, apparently when she was an adult. ( Id . at pp. 1151-1152, 132 Cal.Rptr.2d 688.) The trial court found the witness was "severely emotionally distraught" before the one-way glass was erected to block her view of the defendant ( id. at p. 1152, 132 Cal.Rptr.2d 688 ), but the court did not find the witness was distraught because she feared testifying in the presence of the defendant ( id . at pp. 1157-1158, 132 Cal.Rptr.2d 688 ).
In reversing the judgment, Murphy relied in part on the trial court's approval of the use of the one-way glass, "without holding an evidentiary hearing to determine whether, and to what degree, the testifying victim's apparent anxiety was due to the defendant's presence rather than, for instance, the witness's general emotional fragility or the trauma of testifying in court or revisiting a past experience ...." ( Murphy , supra , 107 Cal.App.4th at pp. 1157-1158, 132 Cal.Rptr.2d 688.) Murphy observed: "[A] court may not, as the court did in this case, dispense with complete face-to-face confrontation merely upon a prosecutor's unsworn representation that defendant's presence was part of a distraught adult witness's problem." ( *61 Id . at p. 1158, 132 Cal.Rptr.2d 688.) Murphy thus concluded that the trial court's ruling was not based upon "an adequate 'case-specific finding of necessity.' " ( Ibid ., citing Craig , supra , 497 U.S. at p. 855, 110 S.Ct. 3157.)
In contrast to Murphy , the need to raise the computer monitor to block F.R.'s view of defendant was not supported solely by the prosecutor's "unsworn representation" that F.R. was too upset to proceed because she feared testifying in the presence of defendant. (Cf. Murphy , supra , 107 Cal.App.4th at pp. 1157-1158, 132 Cal.Rptr.2d 688.) To be sure, the prosecutor made an unsworn representation that raising the computer monitor was necessary to protect F.R.'s emotional well-being, "[g]iven that [F.R.] had indicated that the defendant looked at her the first time she came [into the courtroom]." But after defense counsel replied that defendant made no attempt to look at or intimidate F.R., the court pointed out that the prospect of having to face defendant "clearly affected" F.R. Thus, the record affirmatively shows-and defendant did not dispute-that F.R. was too emotionally upset to testify because she had to face defendant. The trial court did not reposition the monitor based solely on the prosecutor's unsworn representation that F.R. feared testifying in defendant's presence. Rather, it did so based on its own observations of F.R. and her inability to testify before the monitor was repositioned.
Additionally, defendant did not request an evidentiary hearing to determine whether F.R. was too emotionally upset to testify because she had to face defendant, or because she had to testify and recall the molestations, or for another reason. We are mindful that, in Craig , the high court noted that, in making the requisite finding of a case specific necessity, "[t]he trial court *972 must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." ( Craig , supra , 497 U.S. at p. 855, 110 S.Ct. 3157.) But defendant has pointed to no authority requiring the court to hold an evidentiary hearing sua sponte when, as here, and in contrast to Murphy , the court made the requisite case-specific necessity finding under Craig . ( Craig , supra , at p. 855, 110 S.Ct. 3157 ; cf. Murphy , supra , 107 Cal.App.4th at pp. 1157-1158, 132 Cal.Rptr.2d 688.)
In Gonzales and Sharp , no evidentiary hearings to determine the reasons for the child witnesses' trauma were requested or conducted. ( Gonzales , supra , 54 Cal.4th at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Sharp , supra , 29 Cal.App.4th at p. 1783 & fn. 4, 36 Cal.Rptr.2d 117.) Yet the courts in each case upheld the alternative seating arrangements despite the absence of evidentiary hearings in the trial courts, given that the records in each case supported the trial courts' findings of case-specific necessity for the alternative procedures used. ( Gonzales , supra , at pp. 1265-1268, 144 Cal.Rptr.3d 757, 281 P.3d 834 [trial court made "extensive findings" that child would be traumatized if made to testify at trial, and the record "fully justified" allowing the child to testify facing away from the defendant]; Sharp , supra , at pp. 1783-1784, 36 Cal.Rptr.2d 117 [record "fully justified" allowing child to look away from defense table while testifying].) Here, as in Gonzales and Sharp , the record fully justifies the court's finding that blocking F.R.'s view of defendant by raising the computer monitor was necessary to protect F.R. from suffering serious emotional trauma from having to face defendant in court, and to secure F.R.'s testimony.
(c) Extending Craig 's Protections to An Adult Witness/Child Abuse Victim
Murphy reversed the judgment in part on the ground that no evidentiary *62 hearing or case-specific finding of necessity was made, and on the additional ground that the witness was an adult, not a child. ( Murphy , supra , 107 Cal.App.4th at p. 1157, 132 Cal.Rptr.2d 688.) Unlike the child witnesses involved in Craig and Sharp , Murphy reasoned that the case before it did not "involve the 'State's traditional and " 'transcendent interest in protecting the welfare of children.' " ' " ( Murphy , supra , at p. 1157, 132 Cal.Rptr.2d 688 ; Craig , supra , 497 U.S. at p. 855, 110 S.Ct. 3157.) Murphy also noted it had not been directed to "any authority recognizing or establishing that the state has 'transcendent' or 'compelling' interest in protecting adult victims of sex crimes from further psychological trauma that might result from testifying face-to-face with a defendant." ( Murphy , supra , at p. 1157, 132 Cal.Rptr.2d 688.)[4] Relying on this aspect of Murphy , defendant argues that protecting *973 an 18-year-old adult witness like F.R. from the psychological or emotional trauma of face-to-face testimony is a "radical departure" from Craig . Defendant urges this court to adopt a "per se rule" and hold that, once a child abuse victim turns age 18 and has thus reached the age of majority, the state no longer has an interest in protecting the former child from the trauma of face-to-face confrontation. We decline to adopt such a per se rule.
Craig observed that " 'the Confrontation Clause reflects a preference for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.' " ( Craig , supra , 497 U.S. at p. 849, 110 S.Ct. 3157.) Craig specifically recognized that the state's " 'compelling' " interest "in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." ( Id. at pp. 852-853, 110 S.Ct. 3157.) But Craig did not suggest the state no longer has an interest in protecting a child abuse victim from the emotional trauma of face-to-face confrontation if that victim happens to have turned age 18 by the time he or she is called upon to testify. ( Id. at pp. 849-853, 110 S.Ct. 3157 ; see also Lujan , supra , 211 Cal.App.4th at pp. 1505-1506, 150 Cal.Rptr.3d 727 [extending Craig 's protections to all child witnesses of sex crimes, not just child victims of sex crimes].)
In our view, it would be absurd to allow alternative procedures to face-to-face confrontation for child abuse victims only if they are still under age 18 by the time of trial, but deny the same protections to a child abuse victim who, like F.R., have turned age 18 but are no less vulnerable than a minor to the emotional trauma of face-to-face confrontation. Such an arbitrary rule would "commit[ ] the very sin the Supreme Court condemned in Coy -that is, making a 'generalized finding' about the level of trauma certain groups of *63 witnesses experience when confronting defendants." ( Lujan , supra , 211 Cal.App.4th at p. 1506, 150 Cal.Rptr.3d 727, citing Coy , supra , 487 U.S. at pp. 1020-1021, 108 S.Ct. 2798.) Such an arbitrary rule would also require the trial court to treat a witness like F.R., who had turned age 18 only two months before she testified, less favorably than a minor witness who was almost but not yet age 18.
Additionally, Craig does not "mark[ ] the outer boundary" of when alternative procedures to face-to-face confrontation are constitutionally permissible. ( Lujan , supra , 211 Cal.App.4th at p. 1505, 150 Cal.Rptr.3d 727.) Trial courts have "constitutionally conferred, inherent authority to 'create new forms of procedure' in the gaps left unaddressed by statutes and the rules of court. [Citations.]" ( *974 Id . at p. 1507, 150 Cal.Rptr.3d 727.) But courts may not sanction new procedures that are of "dubious constitutional validity." ( In re Amber S. (1993) 15 Cal.App.4th 1260, 1266, 19 Cal.Rptr.2d 404.) Whether the trial court has a particular inherent authority is a question of law subject to de novo review, and the court's exercise of its inherent authority is reviewed for an abuse of discretion. ( Lujan , supra , at p. 1507, 150 Cal.Rptr.3d 727.)
We discern no "dubious constitutional validity" or abuse of discretion in the trial court's decision to allow the computer monitor to be raised to protect 18-year-old 11th grade high school student F.R. from the emotional trauma of facing defendant while testifying, and, indeed, to enable F.R. to testify. ( Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117.) Craig recognized that the right to face-to-face confrontation is not "an indispensable element of the Sixth's Amendment's guarantee of the right to confront one's accusers," and that the right " 'must occasionally give way to considerations of public policy and the necessities of the case.' " ( Craig , supra , 497 U.S. at pp. 849-850, 110 S.Ct. 3157.) Sharp and Gonzales also recognized that the state's important interest in obtaining a witness's testimony must be balanced against the right of the accused to face his or her accusers in court. ( Sharp , supra , at p. 1783, 36 Cal.Rptr.2d 117 ; Gonzales , supra , 54 Cal.4th at p. 1267, 144 Cal.Rptr.3d 757, 281 P.3d 834.)
Defendant began molesting F.R. when she was only eight years old, and the molestations continued until F.R. was age 16, less than two years before trial. Although F.R. was age 18 when she testified, the trial court noted she seemed "fairly immature," and she was only a junior in high school. For several years, defendant had been F.R.'s stepfather, caretaker, and disciplinarian. F.R. was so distraught from having to face defendant, she was unable to testify before the computer monitor was raised to block her view of defendant. On these particular facts, the trial court did not abuse its discretion or violate defendant's confrontation rights in allowing the computer monitor to be repositioned while F.R. testified. ( Craig , supra , 497 U.S. at pp. 852-853, 110 S.Ct. 3157.)
Though we decline to adopt the per se rule urged by defendant, we emphasize that our holding is a narrow one and is based on the particular facts of this case. Generally, it is reasonable to expect that, once a child abuse victim or witness has reached the age of majority, he or she will not need protection from face-to-face confrontation. The older a child abuse victim is when called upon to testify about the abuse, the more difficult it will likely be for the state to make an "adequate showing of necessity" for using an alternative procedure to face-to-face confrontation. ( Craig , supra , 497 U.S. at p. 855, 110 S.Ct. 3157.)
Not all child abuse victims will require protection from face-to-face confrontation, *64 whether they testify as children or after they reach age 18. For *975 example, M.C. was age 16 when she testified, but the People did not claim she needed any protection from facing defendant in court. But other child abuse victims may need protection from face-to-face confrontation, whether they testify as children or adults. Child abuse victims like F.R., who are still young and emotionally or psychologically vulnerable, may need protection even though they have reached the age of majority when they testify. Likewise, child abuse victims who suffer from developmental delays or who are for other reasons particularly susceptible to psychological trauma may need protection from face-to-face confrontation, whether they testify as children or adults.
In each case, the trial court must determine whether the physical or psychological well-being of the child abuse victim or witness before it is sufficiently threatened, and is thus sufficiently important, to outweigh the defendant's right to face the child abuse victim in court. ( Craig , supra , 497 U.S. at pp. 852-853, 110 S.Ct. 3157 ; Lujan , supra , 211 Cal.App.4th at pp. 1505-1506, 150 Cal.Rptr.3d 727.) A criminal defendant's constitutional right to face-to-face confrontation can never be lightly dismissed or overridden, given that it is at " 'the core of the values furthered by the Confrontation Clause.' " ( Coy , supra , 487 U.S. at p. 1017, 108 S.Ct. 2798.)
(d) The Computer Monitor Permissibly Blocked Defendant's Entire View of F.R.
Defendant claims this case represents a "radical departure" from Craig because no court has sanctioned blocking the defendant's entire view of a witness as a permissible infringement on the defendant's right to face-to-face confrontation. Again, we disagree.
Defendant argues this case is indistinguishable from Herbert v. Superior Court (1981) 117 Cal.App.3d 661, 172 Cal.Rptr. 850, decided several years before Craig . Herbert concluded that the defendant's confrontation rights were violated when a five-year-old child witness was allowed to testify at the preliminary hearing, while seated in the witness chair and facing the magistrate who was seated in the jury box. The defendant could hear the child but he could not see her because his view of her was obstructed by the bench. Before the magistrate approved the alternative seating arrangement, the child was "reluctant or unable to testify" and expressed fear of the defendant's presence. ( Herbert v. Superior Court , supra , at pp. 664-665, 668, 172 Cal.Rptr. 850.) Because Herbert preceded Craig , Herbert did not determine whether the alternative seating arrangement was necessary to protect the child from serious emotional trauma as a result of having to face the defendant in court. ( Craig , supra , 497 U.S. at pp. 855-856, 110 S.Ct. 3157.) Sharp distinguished Herbert on this ground. ( Sharp , supra , 29 Cal.App.4th at pp. 1782-1783, 36 Cal.Rptr.2d 117.) We do the same.
*976 Williams , supra , 102 Cal.App.4th 995, 125 Cal.Rptr.2d 884[5] is both more current and closely on point. Williams extended "the principles" discussed in Craig to allow an adult witness to testify by videotape-even though that alternative procedure did not allow the defendant to see the witness or view her demeanor as she testified. ( Williams , supra , at pp. 1007-1008, 125 Cal.Rptr.2d 884.)
In Williams , the adult witness, a victim of the defendant's alleged assaults and criminal threats, was allowed to testify in the courtroom, outside the presence of the *65 jury and the defendant, while the defendant listened to her testimony from a detention cell but could not see her as she testified. ( Williams , supra , 102 Cal.App.4th at pp. 997, 999-1001, 1004-1006, 125 Cal.Rptr.2d 884.) Defense counsel was allowed to go to the detention cell and confer with the defendant before defense counsel concluded his cross-examination of the witness. ( Id . at p. 1006, 125 Cal.Rptr.2d 884.) The adult witness's testimony was videotaped and played for the jury and the defendant-after the defendant and jury returned to the courtroom. ( Ibid . ) The jury was not allowed to know that the witness was unable to testify in front of the defendant. ( Ibid . )
Before the trial court approved the videotape procedure, the witness's treating psychotherapist testified at a pretrial hearing that the witness would be unable to testify in the courtroom where all the parties were present. ( Williams , supra , 102 Cal.App.4th at p. 1005, 125 Cal.Rptr.2d 884.) In the doctor's opinion, "[t]he panic, anxiety and fear would overwhelm her" and she would be unable to " 'think very clearly' " or " 'even make sense' " while testifying in court " 'because of the anxiety and her fear.' " ( Ibid . ) The doctor also opined the witness "would very likely become suicidal and would need to be hospitalized in a mental health unit" if forced to testify in the presence of the defendant. ( Ibid . )
The pretrial hearing was held pursuant to the prosecution's motion to have the witness's prior videotaped statement admitted in lieu of her testimony at trial, pursuant to Evidence Code section 1370, which required the trial court to find the witness was unavailable to testify. ( Williams , supra , 102 Cal.App.4th at p. 1004 & fn. 1, 125 Cal.Rptr.2d 884.) The trial court in Williams did not approve of that more drastic alternative to face-to-face confrontation-testimony by closed-circuit television-and instead found the witness would be deemed unavailable only if she had to testify in the presence of the defendant. ( Id . at p. 1006, 125 Cal.Rptr.2d 884.) In so ruling, the court said it took the defendant's right of confrontation and right to cross-examine "very seriously," and effectively balanced the defendant's confrontation rights against the need to protect the witness. ( Ibid . ) The court approved the less intrusive procedure of allowing the witness to testify by videotape, with the defendant listening in the detention cell. ( Ibid . ) In upholding the use of the videotape procedure on *977 appeal, the Williams court reasoned that the "principles" "discusse[d]" in Craig were properly applied. ( Williams , supra , at pp. 1007-1008, 125 Cal.Rptr.2d 884.) Similarly here, the trial court did not impermissibly infringe on defendant's confrontation rights in allowing the computer monitor to be repositioned to block F.R.'s view of defendant.
Although Williams involved an adult witness with a debilitating level of emotional trauma, we do not view Williams as setting a minimum standard or threshold showing of trauma that must be made before the trial court may approve an alternative to face-to-face confrontation. (See Lujan , supra , 211 Cal.App.4th at pp. 1505-1508, 150 Cal.Rptr.3d 727.) Not all cases will require testimony from a psychotherapist or other health care professional that the witness will suffer extreme or debilitating emotional trauma if required to testify facing the defendant. In some cases, like this one, the court may accurately assess the degree of the witness's emotional trauma without third party testimony or a pretrial hearing.[6]
*66 In this case, F.R. showed up at trial to testify in the presence of the jury and defendant, but the trial court found and the record shows that F.R. was unable to proceed unless she could testify without having to see defendant. Given the state's important interest in obtaining F.R.'s testimony ( Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117 ) and the need to balance that important interest against defendant's right to face-to-face confrontation, the trial court permissibly accommodated F.R.-with the most minimal intrusion possible on defendant's confrontation rights-by allowing the computer monitor to be repositioned to block F.R.'s view of defendant and his view of her.
In our view, the repositioning of the computer monitor in this case was certainly no more intrusive, and was even far less intrusive, on defendant's face-to-face confrontation rights than allowing F.R. to testify facing away from defendant would have been. As discussed, the courts in Sharp and Gonzales approved allowing the child witnesses in those cases to testify with their faces turned away from the defendants-in the case of Gonzales , facing completely away -as permissible infringements on the defendants' confrontation rights. ( Gonzales , supra , 54 Cal.4th at p. 1265, 144 Cal.Rptr.3d 757, 281 P.3d 834 ; Sharp , supra , 29 Cal.App.4th at p. 1783, 36 Cal.Rptr.2d 117.)
When a witness testifies facing away from the defendant, the defendant's view of the witness's face and demeanor are largely, if not entirely, blocked, as defendant's view of F.R. was here. In addition, the witness chair and the *978 podium for questioning are placed in unusual positions, making the alternative seating arrangement obvious to the jury. In this case, the repositioning of the computer monitor was never pointed out to the jury, and it is likely that the jury did not notice that the monitor was blocking F.R.'s view of defendant as she testified, or his view of her. Raising the monitor by only a few inches was, in our view, far less intrusive than any other alternative procedure would have been.[7] *67 The repositioning of the monitor was also far less intrusive than a one-way screen or any other obvious physical barrier would have been.[8] Testimony by videotape ( Williams , supra , 102 Cal.App.4th at pp. 1006-1007, 125 Cal.Rptr.2d 884 ) or by closed-circuit television ( Craig , supra , 497 U.S. at pp. 852-856, 110 S.Ct. 3157 ) are drastic and extremely intrusive alternatives to face-to-face confrontation, because they do not involve live, in-court testimony. (See also § 1347 [allowing certain child molestation victims age 13 and younger to testify by closed-circuit television, based on compelling evidence shown by pretrial motion]; § 1347.5 *979 [allowing adults and children with disabilities to testify by closed-circuit television under same evidentiary standard and procedure].)
When a witness is allowed to testify by videotape or closed-circuit television, the witness is not giving live, in-court testimony, in the presence of the jury or the defendant. Here, F.R. testified in court, in the presence of the jury and defendant, and defendant could hear her answers and contemporaneously assist his counsel in cross-examining her. In these circumstances, repositioning the computer monitor was, as the trial court described it, "at best ... a small infringement" on defendant's confrontation rights-even though it blocked defendant's entire view of F.R. As Craig emphasized, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." ( Craig , supra , 497 U.S. at p. 845, 110 S.Ct. 3157, italics added.) This central concern of the confrontation clause was served here.
4. Defendant Has Forfeited His Claim of Error Regarding A.J.R. and A.M.R.
Defendant claims his Sixth Amendment face-to-face confrontation rights were further violated when the computer monitor was raised while A.J.R. and A.M.R. testified after F.R. testified. The People argue defendant has forfeited this claim because he did not object when the monitor was raised, or left raised, when A.J.R. and A.M.R. testified. We agree with the People. Though defense counsel objected on face-to-face confrontation grounds when the monitor was raised for F.R.,[9] he did *68 not object when it was raised for either of the two younger girls, A.J.R. or A.M.R. Defendant thus failed to preserve his claim of Sixth Amendment error regarding the trial testimony of A.J.R. and A.M.R. (See People v. Alvarez (1996) 14 Cal.4th 155, 186, 58 Cal.Rptr.2d 385, 926 P.2d 365 [Sixth Amendment claim forfeited on appeal by failure to raise timely and specific objection below].)
Defendant argues his failure to object when the monitor was raised for A.J.R. and A.M.R. should be excused because it would have been futile, given that the trial court overruled his objection to raising the monitor for F.R. ( People v. Boyette (2002) 29 Cal.4th 381, 432, 127 Cal.Rptr.2d 544, 58 P.3d 391.) We disagree. A.J.R. and A.M.R. were different witnesses *980 than F.R. The trial court overruled the objection to raising the monitor for F.R. based solely on F.R.'s upset emotional state and her inability to proceed when she first stepped to the witness stand, and her apparent anxiety for having to face defendant and testify against him. Nothing in the record indicates that the trial court would have overruled separate and specific objections to raising the monitor for either A.J.R. or A.M.R., simply because it overruled the objection to raising the monitor for F.R. ( Ibid . )
5. Defendant Has Not Shown Ineffective Assistance of Counsel
Defendant alternatively claims his defense counsel rendered ineffective assistance in failing to object to raising the monitor for A.J.R. or A.M.R. To establish a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's representation failed to meet an objective standard of professional reasonableness, and (2) he was prejudiced by his counsel's deficient representation, that is, absent the deficiency there is a reasonable probability the result at trial would have been more favorable to the defendant. ( Strickland v. Washington (1984) 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 ; People v. Frye (1998) 18 Cal.4th 894, 979, 77 Cal.Rptr.2d 25, 959 P.2d 183.) There is a strong presumption that counsel's conduct falls within the wide range of professional reasonableness, and great deference is given to counsel's tactical decisions. ( Strickland v. Washington , supra , at p. 688, 104 S.Ct. 2052 ; People v. Frye , supra , at p. 979, 77 Cal.Rptr.2d 25, 959 P.2d 183.) On appeal, a conviction may not be reversed based on ineffective assistance of counsel unless the record affirmatively shows there was no rational tactical purpose for counsel's act or omission. ( People v. Frye , supra , at pp. 979-980, 77 Cal.Rptr.2d 25, 959 P.2d 183.)
Defendant has not shown his trial counsel's performance was deficient because he did not object to raising the computer monitor, or leaving the monitor raised, when A.J.R. and A.M.R. testified. The record shows counsel had a rational, tactical purpose for not raising such objections: Even with the computer monitor raised, F.R. was emotional when she testified. Because A.J.R. (age 14) and A.M.R. (age 13) were several years younger than F.R. (age 18), defense counsel could have reasonably believed that allowing the monitor to be raised for A.J.R. or A.M.R. would prevent any emotional displays by them while they testified, and would thus minimize any juror sympathy for all of the girls.[10]
*981 B.-G.**
*69 IV. DISPOSITION
The matter is remanded to the trial court with directions to resentence defendant on counts 1, 12, and 14. In all other respects, the judgment is affirmed.
I concur:
RAMIREZ, P.J.
SLOUGH, J.

Defendant was convicted of 11 counts of committing a lewd act on a child under age 14 (Pen. Code, § 288, subd. (a) ; counts 2-11, 13) (all further statutory references are to the Penal Code unless otherwise indicated), one count of a lewd act on a child under age 16 (§ 288, subd. (c)(1) ; count 1), one count of oral copulation with a child under age 14 (§ 288a, subd. (c)(1); count 12), and one count of sexual penetration with a child under age 14 (§ 289, subd. (j); count 14). The jury also found that defendant engaged in substantial sexual conduct in counts 2 through 11 and 13 (§ 1203.066, subd. (a)(8)), and that these counts were committed against more than one victim (§ 667.61, subd. (e)(4)). Defendant admitted he had a prior conviction, on February 2, 1999, for committing a lewd act on a child under age 14. (§ 288, subd. (a).)

Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose-namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others-whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (People v. Brown (1994) 8 Cal.4th 746, 749-750, 35 Cal.Rptr.2d 407, 883 P.2d 949.)

The court noted defense counsel had objected to some of the prosecutor's questions of F.R. as leading, and the court agreed that some of the questions were leading but was giving the prosecutor "some leeway in terms of the questioning." The court explained that, though F.R. was 18 years old, she seemed "fairly immature." On that point, defense counsel noted that F.R. was 18 years old and "not a child," but an adult.

Murphy suggested it did not agree with the court in People v. Williams (2002) 102 Cal.App.4th 995, 125 Cal.Rptr.2d 884 (Williams ), which held that the trial court properly extended the "principles" "discusse[d]" in Craig in allowing an anxiety-stricken adult witness to testify by videotape while the defendant listened to her testimony from a detention cell. (Williams, supra, at pp. 1004-1008, 125 Cal.Rptr.2d 884.) Murphy noted that Williams did not identify any authority for the proposition the state had a transcendent or compelling interest in protecting adult victims of sex crimes from the further psychological trauma that might result from face-to-face confrontation. As we discuss, infra, we agree with the Williams court's broader reading and extension of the principles discussed in Craig to protect adult witnesses from the additional emotional trauma of having to face the defendant in court.

See footnote 4, ante.

Testimony by closed-circuit television, which is statutorily allowed for child molestation victims age 13 years or younger and adults or children with a disability, require the court to find the witness is unavailable to testify unless the closed-circuit television procedure is used. (§§ 1347, 1347.5.)

Significantly, defense counsel did not ask the trial court to instruct the jury to disregard the placement of the computer monitor for F.R.-likely because the jury may not have noticed it was blocking F.R.'s view of defendant, or his view of her, unless its placement was pointed out to the jury. Nor did defense counsel ask the court to approve a different alternative procedure than repositioning the monitor, such as allowing F.R. to testify facing away from defendant, as in Sharp and Gonzales, or allowing F.R. to testify outside the presence of defendant and the jury, either by videotape as in Williams, or by closed-circuit television as in Craig. Defense counsel had a tactical reason for not making any of these requests: Any of these alternatives would have made it obvious to the jury that F.R. was testifying without looking at defendant.
Upon request, a defendant should be entitled to an instruction requiring the jury to disregard any alternative seating arrangement or similar device. (See, e.g., Murphy, supra, 107 Cal.App.4th at pp. 1152-1153, 132 Cal.Rptr.2d 688 [instructing jury to disregard use of one-way glass or "plastic window device"].) But in some cases, it may be tactically advisable not to request such an instruction that draws attention to the alternative procedure. In other cases, the defense may reasonably determine it is tactically advisable to point out the alternative arrangement to the jury by arguing that the witness's credibility should be doubted because the witness was not "looking" the defendant "in the eye" while testifying. (Coy, supra, 487 U.S. at pp. 1018-1019, 108 S.Ct. 2798.) As Coy observed, the trier of fact is free to draw its own conclusion about the credibility of a witness who does not "fix his eyes" upon the defendant but "studiously" looks elsewhere. (Id. at p. 1019, 108 S.Ct. 2798.)

In the wake of Coy and Craig, courts in other jurisdictions have disapproved the placement of an opaque or physical barrier between the defendant and the witness as violating the defendant's face-to-face confrontation rights under Coy. (See, e.g., People v. Lofton (Ill. 2000) 194 Ill.2d 40, 251 Ill.Dec. 496, 740 N.E.2d 782 [disapproving placement of two podiums blocking the witness's and the defendant's views of each other]; People v. Mosley (Colo. Ct.App. 2007) 167 P.3d 157 [disapproving placement of easel]; cf. Fusion v. Tilton (S.D.Cal., Sept. 10, 2007, No. 06-CV-0424 H) 2007 U.S. Dist.Lexis 66977 [approving child testifying with her hand blocking her face as not involving use of a "physical barrier"].) Coy noted it was "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter" than the one-way screen. (Coy, supra, 487 U.S. at pp. 1014-1015, 1020, 108 S.Ct. 2798, italics added.) But Coy predates Craig, which allows for exceptions to face-to-face confrontation. (Craig, supra, 497 U.S. at pp. 844, 853-856, 110 S.Ct. 3157.) And in this case, the computer monitor was not an obvious physical barrier. Rather, it was part of the normal courtroom setting.

The People mistakenly claim that defense counsel did not object to the computer monitor being raised for F.R. until after F.R. testified. The record shows defense counsel placed on the record his objection to the monitor being raised for F.R. during the recess the court took at 11:53 a.m., around 48 minutes after F.R. began testifying at 11:05 a.m., and the computer was raised to block her view of defendant. For this reason, we have considered defendant's confrontation claim regarding F.R. preserved for appeal.

The People argue defendant cannot show his counsel was deficient in failing to object when the monitor was raised for A.J.R. and A.M.R. because the record does not show defendant was unable to see A.J.R. or A.M.R. as they testified, given that the girls were "different witnesses with different heights." This argument is unfounded. There is no indication that either A.J.R. or A.M.R. were taller or shorter than F.R. Moreover, and as noted, before closing arguments the prosecutor clarified that the computer monitor was raised while A.J.R. and A.M.R. testified. The only ostensible purpose in raising the monitor for any of the girls was to prevent them from having to see defendant while they testified against him.

See footnote *, ante.